### GULF REFINING CO. v. BROWN.
### No. 4215.

Circuit Court of Appeals, Fourth Circuit.
Jan. 4, 1938.

Tom Irvin Gill, of Danville, Va. (Carter & Williams and Margaret L. Carter, all of Danville, Va., on the brief), for appellant.

E. Walton Brown, of Danville, Va. (Clinton A. Fowler, of Danville, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The Gulf Refining Company, defendant in the District Court, appeals from a judgment of $10,000 rendered at the suit of the administratrix of the estate of Percy Edward Brown upon the claim that he had come to his death by reason of the neglect of agents of the refining company, in that they had sold and delivered as kerosene oil a dangerous mixture of kerosene and gasoline which exploded when he made use of it for the purpose of kindling a fire in a wood stove. The question of contributory negligence was submitted to the jury and no defense on this ground was raised in this court. The refining company, however, does contend that the evidence was not legally sufficient to justify the submission of the case to the jury; and that, even if negligence was proved, it was not attributable to the defendant but rather to one P. S. Ford who sold and delivered the goods, it is claimed, as an independent contractor.

The petroleum products of the refining company were distributed in Pittsylvania county, Va., in which the accident occurred, from a tank wagon station in the city of Danville, under an agreement called a consignment contract. It provided that the consignor should furnish a storage ware-

house at Danville and should ship to the consignee a stock of oils, gasoline, and other petroleum products to be sold by the consignee at prices fixed by the consignor; that the consignee should devote his best efforts to the sale and distribution of the products in the territory assigned to him and transmit to the consignor a monthly statement of sales and stock on hand. Sales were to be made for cash, unless credit sales were authorized in writing by the consignor. Daily statements of sales and deliveries were to be mailed to the consignor and daily remittances of the money received from cash sales and of signed receipts for credit sales were to be made by the consignee. Every month the consignor was to render a written statement and to remit to the consignee the commissions earned during the preceding month.

It was also expressly agreed that the consigned stocks should remain the property of the consignor until sold in the regular course of business; that the consignee should have entire charge of the management and operation of the business; that he should pay all license fees and furnish all necessary equipment, trucks, tank wagons, etc.; that he should furnish his own helpers and employees, and pay the expenses of conducting the business, and that the consignor should not in any event be responsible for the negligence of the consignee or his employees in conducting the business; that the consignee and his employees should not be deemed to be the employees of the consignor and that the consignee should carry compensation and public liability insurance for himself and his employees. The consignor reserved the right to erect and maintain on the warehouse property such signs as it might deem necessary to advertise its products; and the consignee was authorized to use the words "Distributor, Gulf Refining Products" on his stationery and equipment, but he was forbidden to represent himself as an agent or employee of the consignor and agreed to indemnify the consignor against all claims for acts or omissions of himself or employees in the management of the business, negligent or otherwise. The contract was not assignable and was subject to termination by either party on ten days' written notice to the other.

The product used by the deceased at the time of the accident was transported to the home of Miss Nellie Dodson on a delivery truck bearing the name of the refining company or the symbol "Gulf Products." The truck was in charge of O. E. Russell and P. S. Ford, Jr., employees of the consignee. They made out a ticket headed "P. S. Ford, Distributor for Gulf Refining Company" showing a sale to Miss Dodson of 55 gallons of kerosene delivered from the Danville station. The sales ticket showed that payment for the goods was to be made at the office of the refining company in Philadelphia, but the money was actually paid to Russell and Ford and deposited by them to the credit of the company in its Danville Bank. Five gallons of this product were delivered directly by Ford's employees to the wife of the deceased as a customer of Miss Dodson; and it was taken to the home of the decedent. The evidence of the plaintiff tended to show that the oil so delivered, instead of being standard kerosene, contained 16 per cent. of gasoline. The delivery truck had three separate tanks or compartments and, on the occasion described, the front and middle tanks were filed with gasoline and the rear tank, ordinarily used for gasoline, was filled with kerosene. Before the delivery to Miss Dodson, 108 gallons of kerosene were by mistake pumped into the gasoline tank of a customer who wanted gasoline, and, the mistake being discovered, the liquid in the customer's tank was pumped back into the truck. From the ensuing mixture, the delivery to Miss Dodson was made.

It is the position of the defendant that the evidence relating to the explosion and the injury to the deceased was too indefinite to justify the inference that the accident was caused by the inflammable character of the mixture. The deceased lived in a log house, consisting of a main room, two stories high, and two one-story shed rooms, one of which was the kitchen. The main room was used as a living room and bedroom for husband and wife and two young children. It was the daily custom of the deceased, when he arose in the morning, to light a fire in the wood stove in the kitchen by placing kindling wood in the firebox, pouring kerosene over it from a 1-gallon can, and applying a match. The 1-gallon can had been filled from the 5-gallon can the night before the catastrophe. About 5:30 a. m. the next morning, the deceased got out of bed and went to the kitchen in his underclothes. His wife remained in bed but was awake. She testified that her husband had been in the kitchen only long enough to put the kindling in the stove and light the fire when she heard an explosion,

like a gun shot. Running to the kitchen, she found it so filled with dense black smoke that she could not see her husband. She endeavored to leave the room by other doors but was unsuccessful, and in a very brief time her husband came into the main room from the kitchen with his garments afire and so badly burned that he died the same day. When the neighbors responded to the alarm, they found that the kitchen walls and ceiling, the kitchen furniture, and the stove wood in the corner of the room were on fire. Two of the caps of the stove top were off, the 1-gallon can was lying on the floor with the bottom off, and the window glass had been blown out. There was a little fire in the wood in the firebox in the stove as if some one had just started to build a fire.

There was evidence that some of the contents of the 5-gallon can had been used in a lamp the night before without explosion, and also that other persons had used some of the mixture bought by Miss Dodson in lamps and for making fires without harm. Two witnesses for the defendant testified that in their opinion the bottom of the 1-gallon can was not blown off by an explosion, since the weaker side seam of the can had not been disrupted, and hence they concluded that the can had been set on a hot stove so as to melt the solder and release the contents of the can. It would require a temperature of 400 degrees Fahrenheit to accomplish this result.

The defendant contends that this evidence justifies the inference that the fire was caused by setting the can on a hot stove or that, in the view most favorable to the plaintiff, it is impossible, in the absence of direct testimony, to say whether the accident was caused in this manner or by an explosion while the fire was being kindled; and that since the circumstances proved are consistent with either of the two theories, and there is nothing to show that one, rather than the other, is correct, the plaintiff's case must fall. See Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Bonner v. Texas Co., 5 Cir., 89 F.2d 291.

But a chemist testified, without contradiction, that an analysis of the contents of the 5-gallon can disclosed a liquid that gave off a vapor with a flash point on contact with a lighted match below 50 degrees Fahrenheit, and that the mixture was not safe for domestic consumption. Hence the dangerous character of the delivered goods and their susceptibility to explosion and disastrous accident was proved. Moreover, the short time elapsing between the entry of the deceased into the kitchen and the explosion, and the absence of a hot fire in the stove after the explosion, tended to show that the bottom of the 1-gallon can was not melted off. We conclude, therefore, that the evidence was sufficient to sustain a reasonable inference of an explosion from the use of an adulterated and dangerous mixture.

The refining company also contends, as we have seen, that under its contract with P. S. Ford, and under the other facts relating to his employment and activities, he was an independent contractor, so that the company had no liability for his neglects or those of his employees. It is pointed out that the contract expressly imposes upon Ford the entire charge of the management and operation of the business, the furnishing of equipment and trucks, and the employment and payment of helpers, for whose actions, in the conduct of the business, the company should have no responsibility. This denial to the refining company of any right or power to control the operations of the business, and this assumption by Ford satisfies, it is said, the test by which an employee or servant is distinguished from an independent contractor.

It may be admitted, if we confine our attention to these provisions of the contract, that Ford was constituted an independent contractor, Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; but this is to see only a part of the picture. The tank service station and petroleum products were the property of the refining company. Despite Ford's agreement to pay all license taxes, the refining company paid the annual tax for the privilege of doing business as a wholesale merchant and Ford himself had no license to conduct the business of merchant; and it paid the license tax for the privilege of operating three motor trucks, although the trucks belonged to Ford or a corporation which he controlled. It maintained a regular account in the bank at Danville in which Ford deposited the proceeds of sale, and Ford had no authority to check on this account. He kept a separate account in which he deposited his commissions and other personal funds and from which he paid the wages of his employees. The trucks used in making the delivery were painted an orange (Gulf) color and carried the company's emblem "Gulf Oil Products."

When all of the facts are considered, it is seen that Ford's control over the business was limited indeed and that it was well-nigh within the power of the company as a practical matter to dictate his every action. The company owned the goods, fixed the price, limited him to cash sales or credit terms which it imposed, owned and controlled the disposition of the proceeds of sales, and required the use of signs indicating that the station, the goods, and the trucks (contrary to fact) were its own. It was a consignment business so arranged as to leave little or no discretion to the consignee in the sale of the goods. His province was merely to find customers, make deliveries, and collect the money. There was some leeway in the choice and management of employees and in the amount of their salaries which the distributor was required to pay out of his commissions. But even here the company was the dominant figure. It stipulated that the distributor carry workmen's compensation insurance and exacted an agreement of indemnity from the distributor as to the delicts of his employees, promises quite unnecessary if it had no responsibility for their acts. Finally it forbade the assignment of the contract and reserved the right to terminate it at will at any time on ten days' notice and thus completely put an end to the distributor's opportunity to profit by the connection.

Some conflict of authority has arisen as to whether the distributor, under such a contract, is an employee of the oil company, or an independent contractor for whose delicts the company has no responsibility. Some courts have thought that the oil company has no right to supervise deliveries, select the number and character of the vehicles, choose the employees engaged in delivery, fix their wages, or control the manner in which delivery should be made; and hence have concluded that the relationship of independent contractor was created. Greaser v. Appaline Oil Co., 109 W.Va. 396, 155 S.E. 170; Gulf Refining Co. v. Wilkinson, 94 Fla. 664, 114 So. 503; Inman v. Gulf Refining Co., 194 N.C. 566, 140 S.E. 289. But the decided weight of authority is to the contrary. Facts like those pointed out above as indicating a very complete control by the company of its products during the process of sale and delivery have been found determinative, and it has been decided that the oil company has not only held out the distributor as its employee, but has controlled and directed him in important particulars and in practical effect has retained power to subject him in the course of the business to its will and direction in any respect in which it might choose to do so. Standard Oil Co. v. Parkinson, 8 Cir., 152 F. 681; Gulf Refining Co. v. Huffman & Weakley, 155 Tenn. 580, 297 S.W. 199; Magnolia Petroleum Co. v. Johnson, 149 Ark. 553, 233 S.W. 680; Angell v. White Eagle Oil & Refining Co., 169 Minn. 183, 210 N.W. 1004; Texas Co. v. Jackson, 174 Miss. 737, 165 So. 546; Texas Co. v. Mills, 171 Miss. 231, 156 So. 866; Goff v. Sinclair Refining Co., La.App., 162 So. 452; Tate v. Claussen-Lawrence Const. Co., 168 S.C. 481, 167 S.E. 826, with which compare Sams v. Arthur, 135 S.C. 123, 133 S.E. 205; Johnson v. Steele, 154 Or. 137, 59 P.2d 237; Magnolia Petroleum Co. v. Pierce, 132 Okl. 167, 269 P. 1076, 61 A.L.R. 218; Fischer v. Havelock, 134 Cal.App. 584, 25 P.2d 864; United States Fidelity & Guar. Co. v. Industrial Commission, 42 Ariz. 422, 26 P.2d 1012; Maryland Casualty Co. v. Kent, Tex. Com.App., 3 S.W.2d 414; Lynn v. Roberts, 257 Mich. 116, 241 N.W. 214.

We are in accord with the latter conclusion. It is only by consideration of all of the facts pertaining to the relationship in any case, including the provisions of the contract, the actual conduct of the parties, and the conditions of the business in which they are engaged, that it can be determined whether the distributor is endowed with that control over his own methods and means of doing the work which is the test of an independent contractor. No more definite test has been devised, and the Restatement of Agency itself, section 220 (2), merely lists certain matters of fact which, amongst others, may be considered in determining whether one acting for another is a servant or independent contractor.[1] When these nonexclusive tests are applied to the facts of the pending case, we find confirmation of the conclusion we have reached. For cases concerning the liability of the owner of goods for torts committed during delivery in which under dissimilar circumstances this court found the relationship of independent contractor to exist, see Craige v. Austin Powder Co., 4 Cir., 91 F.2d 664; P. F. Col-

---

[1] See Roscoe T. Steffen on "Independent Contractor and the Good Life," 2 Univ. of Chicago L. R. 501.

lier & Son Distributing Corp. v. Drink-water, 4 Cir., 81 F.2d 200.

■ It is suggested, however, in accordance with a few of the decisions, that even if the distributor in this case were an agent or employee of the oil company, it does not follow that the company was responsible for the negligence of the helpers and employees whom he was expressly authorized under the contract to appoint to assist in the delivery of the goods and to manage and control at his own risk. Texas Co. v. Brice, 6 Cir., 26 F.2d 164; Sinclair Refining Co. v. Veal, 51 Ga.App. 755, 181 S.E. 705. For this distinction, these cases rely on certain selected passages from Mechem on Agency, 2d Ed., § 326, p. 240, § 330, p. 242, § 1863, p. 1447, wherein the author, considering the subject of privity of contract between a principal and one employed by the agent to assist him in his work, declares that in some circumstances the principal may be willing to consent that the agent may perform the duty through a substitute employed at the agent's risk and expense, when he would not be willing, at his own risk and expense, to have such a substitute employed. From these statements the conclusion has been drawn in the cited cases that, even when the relationship of independent contractor does not exist, the principal may avoid liability for the conduct of subagents by entering into an agreement like that in the present case wherein the agent is empowered to employ assistants to do the work and agrees to assume responsibility for their acts. The cited passages from Mechem hardly justify the conclusions drawn therefrom. On the contrary, the author's opinion seems to be (see § 1872, p. 1456) that, when there is an express or implied consent to the appointment of the subagent as the agent of the principal, there arises such a privity between the subagent and the principal as renders the latter liable for the acts of the subagent to the same extent as in the case of any other agent; but that, when the agent stands in the attitude of an independent contractor, the principal is liable only in those cases in which he would be liable for the acts of the agents of any other independent contractor. See, also, Restatement of Agency, §§ 2, 220–227, 250.

It is clear that a principal may not escape liability to third persons for the torts of a subagent, appointed by his agent with his consent, merely by entering into a contract with his agent under which the latter assumes sole responsibility for the subagent's conduct. The responsibility of the principal to third persons imposed by law may not be so lightly disposed of. The important question in every case is whether the agent is in truth an independent contractor or the servant of the principal. If the latter relationship is found to exist and the acts to be performed are in the course of the business upon which the servant is employed, the liability of the principal is the same whether they are performed by the servant or by an assistant duly appointed. Any other conclusion would effectually nullify the responsibility of the principal for many of the tortious acts that are committed under conditions of modern life. In the cited cases in which the relationship of independent contractor was thought to exist, the oil company was held responsible not only for the conduct of the distributor, but also for the conduct of his assistants or servants. See Magnolia Petroleum Co. v. Johnson, Gulf Refining Co. v. Huffman & Weakley, Texas Co. v. Jackson, Goff v. Sinclair Refining Co., and Tate v. Claussen-Lawrence Construction Co., supra.

It is conceivable, of course, that the business of the master could be divided so that parts thereof would be performed by a servant and other parts by an independent contractor. It is suggested here that the business of delivery of petroleum products under the contract was so separated from other activities that at least as to it the distributor was an independent contractor. An attempt to this end has undoubtedly been made but it is found only in the language of the contract and not in the actual substance of the situation. The distributor was charged with both the sale and delivery of the goods from the tank wagon station; and in the practical operation of the business, sales and deliveries to customers from the wagons were simultaneous. The same employees who made the sales and collected the money from the customers made the deliveries to them. How rigid was the control of the oil company over sales and collections we have already seen; but in practical effect the control over deliveries, the words of the contract notwithstanding, was equally effective. The necessity for assistants to the distributor was inherent in the business; the selection of men resident in the locality and the supervision of their conduct was necessarily reposed in some local representative, so that the actions of the parties would have been substantially

the same if the contract had contained no clause conferring upon the distributor full control of the men he employed. The power of the company to put an end·to the employment of the distributor at will rendered him at all times and in all respects subservient to its will. The language of the contract referred to must therefore be regarded as a futile attempt to secure the benefits of complete control while repudiating its liabilities. A somewhat similar attempt was held ineffective when a refining company entered into license agreements with numerous dealers and yet retained practical control over the operation of the stations with the result that it was held subject to the taxing provisions of a chain store act. Gulf Refining Co. v. Fox, D.C., 11 F.Supp. 425, affirmed 297 U.S. 381, 56 S.Ct. 510, 80 L.Ed. 731.

If anything else were needed in the pending case to fix the liability of the oil company, it is found in the fact that the negligent conduct which led to the death of the decedent was performed in the course of a sale of the company's goods, that is to say, in that department of the distributor's activities which ·were so completely regulated and controlled by the company as to leave no place for an independent contractor.

Affirmed.