Olin MANN, as Administrator of the Estate of Dale Galloway, deceased, Appellee.

v.

BOWMAN TRANSPORTATION, INC., Appellant.

No. 8421.

United States Court of Appeals Fourth Circuit.

Argued Oct. 25, 1961.

Decided Feb. 23, 1962.

**506**

O. G. Calhoun, Jr., Greenville, S. C. (W. Francis Marion, Greenville, S. C., on brief), for appellant.

James R. Mann, Greenville, S. C., for appellee.

Before SOPER, BOREMAN and BELL, Circuit Judges.

BOREMAN, Circuit Judge.

This is an action to recover damages for wrongful death under South Carolina's Lord Campbell's Act.[1] Plaintiff is the administrator of the estate of Dale Galloway, a twenty-year old textile worker who was killed in a collision between an automobile in which he was a passenger and a tractor-trailer vehicle owned by the defendant, Bowman Transportation, Inc., and driven by its employee, Hoyt Wehunt. The action is brought on behalf of the estate for the benefit of Dale's divorced parents, and it is charged that the fatal accident was caused by the negligence of the driver of defendant's truck. Defendant denied negligence and charged that the deceased's contributory negligence would bar the right of the estate to recover even if the truck driver were negligent. The issue of contributory negligence was withdrawn from the jury's consideration by the District Judge, and the jury returned a verdict in favor of plaintiff for $55,000, actual damages (no punitive damages). The District Court denied Bowman's motion for a new trial or, in the alternative, for a remittitur of one-half the amount of the jury award and Bowman appeals. We find no error.

Both the deceased and Mrs. Cecil Ruth Chapman, the driver of the automobile in which Dale was riding when killed, were textile workers and were enjoying a week-long Fourth of July holiday in 1960. On Tuesday night, July 5, 1960, about ten thirty, Mrs. Chapman, accompanied by two daughters, encountered Dale at Liberty, South Carolina, where they had driven to see a friend; at that time Mrs. Chapman and her family were living in nearby Easley, South Carolina. (Unless otherwise indicated, all communities hereinafter referred to are in South Carolina.) After talking for a few minutes the four were joined by one Norman Harrison, a friend of Dale and the Chapman family. At the daughters' suggestion, they all went to a restaurant or roadhouse between Clemson and Courtney, a distance of not more than twenty miles, to hear a band. Mrs. Chapman drove the car. While there some of the group danced for a short time, and Dale, Norman and one of Mrs. Chapman's daughters drank at least one bottle of beer each. Mrs. Chapman and her other daughter had soft drinks. About two o'clock on the morning of July 6, 1960, the five members of the party left the "night spot" to drive to a diner a few miles away to get something to eat. They found the diner closed and at the request of Norman Harrison, they then proceeded to a residence (of an unidentified man) near Pendleton. Finding a light on in the kitchen, Norman and Dale entered the house, stayed there a few minutes and returned to the car. The record is silent as to their reason for visiting the house. From that point Mrs. Chapman and her party returned to Liberty where they found a drive-in restaurant open and stopped to eat. The party remained at the drive-in about two hours

1. Code of Laws of South Carolina 1952, § 10–1951.

(during a heavy cloudburst of rain), but while there one of the girls in the group became nauseated and was later given some liquor by a friend "to settle her stomach." There was testimony to the effect that the party became loud and boisterous and they were asked to leave. About five o'clock in the morning they started for home. With Mrs. Chapman continuing to drive they proceeded about two miles to a point near Norris on United States Highway 123 at the intersection of the county road which led to their left and to Norman's home. Dawn was then breaking. As Mrs. Chapman was preparing to make a left turn off the highway, defendant's truck crashed into the rear of her car fatally injuring Dale, who was riding in the back seat.

At the time of the collision Mrs. Chapman was waiting in her right lane of the two-lane highway to permit a car which she perceived approaching from the opposite direction to clear the traffic lane to her left so that she could safely make her left turn. Her car was stopped on an upgrade. The truck hit Mrs. Chapman's car at the moment the oncoming car owned and operated by W. D. Gibson was directly opposite and passing the Chapman vehicle. Mr. Gibson and his wife, who was riding beside him, were thus witnesses to the accident; both testified at the trial.

While Mrs. Chapman and her party were driving around on the night and morning of July 5–6, defendant's driver, Hoyt Wehunt, and a relief driver had been en route from Richmond, Virginia, to Cummings, Georgia. Wehunt had slept for several hours in the truck cab's sleeping compartment before taking over the driving at approximately 3:30 on the morning of the accident. At a point about two miles west of Norris on Highway 123, he saw, over the crest of a hill and ahead, the headlights of an oncoming car which he later learned was occupied by Mr. and Mrs. Gibson. Wehunt dimmed the truck's headlights, and after he had proceeded up the grade about 300 feet, the truck's lights illuminated Mrs. Chapman's car stopped on the highway which, according to Wehunt's own testimony, was only 28 to 32 feet in front of the truck. Wehunt immediately applied his brakes but nevertheless struck the rear of the stopped vehicle; the truck had been traveling at a speed of about 40 miles an hour before the brakes were applied. The Gibson car stopped a short distance after passing the point of the collision and Mr. and Mrs. Gibson returned to the scene. They, with Wehunt, assisted in the removal of the injured occupants from the car amid what was described as the strong odor of alcohol which was still present in and about the Chapman car nearly an hour after the accident, according to a highway patrolman who investigated.

The jury's verdict of $55,000 in favor of the administrator plaintiff, for the benefit of Edna B. Galloway, decedent's mother, and Claude T. Galloway, decedent's father, was returned without apportionment of the award between the two beneficiaries. Dale lived with his mother and contributed to her support; he had neither wife nor children. His father lived and worked in Chicago, Illinois, taking tickets at a theater. Dale contributed nothing to his father's support. The father and mother were divorced in 1944, when Dale was four years old, and there is no direct evidence that Mr. Galloway and his son saw or wrote to one another at any time after the divorce though it does appear that Mr. Galloway lived in South Carolina for a time around 1950 and had visited his family at Christmas time, presumably in 1959.

Four questions are presented on this appeal. Defendant first contends that the District Judge erred in ruling as a matter of law that there was no contributory negligence by Dale Galloway and in removing that issue from jury consideration. It is argued that the record shows both direct and circumstantial evidence from which the jury could have inferred that Dale did not exercise reasonable care for his own safety and that his negligence was at least a partial cause of his fatal injury. Defendant

points out that the testimony of Wehunt, Gibson and the patrol officer with respect to the strong odor of alcohol in the Chapman car after the accident indicates that some members of the party had consumed more alcoholic beverages than mentioned in Mrs. Chapman's testimony. She testified that to her knowledge Norman, Dale and one of her daughters each drank a bottle of beer at the first stop during the evening's adventures but acknowledged that each may have consumed more at that stop; it was shown, however, that the drive-in where the party later stopped did not sell beer. It is suggested that Dale had consumed alcohol to such an extent that he did not exercise proper care for his own safety and that Mrs. Chapman was driving under the influence of intoxicants, to Dale's knowledge. It is also suggested that the jury could have found from the testimony that Mrs. Chapman was weary because of the fact that she had lost sleep and rest on the night of July 4 while ministering to her badly sunburned daughters and had driven around without sleep during the night of the accident so that she was unable to safely operate a motor vehicle. The contention is that Dale knew, or should have known, that Mrs. Chapman was in no condition to drive because of fatigue. Defendant also argues that Dale could have been found negligent in failing to warn Mrs. Chapman to move her car off the highway or to drive forward when he saw the reflections from the lights of the truck approaching from the rear and knew, or should have known, that the rear signal lights on Mrs. Chapman's car were not operating. Other suggestions of a highly speculative nature are made by the defendant, but we do not consider it necessary to discuss them.

A careful reading of the record in this case has convinced us that the District Judge did not err in withdrawing from the jury the issue of contributory negligence. Defendant had the burden to affirmatively show contributory negligence on the part of the deceased and this the defendant failed to do. At the trial and in the brief on appeal, defendant has repeatedly insinuated that both Mrs. Chapman and Dale were under the influence of intoxicants. However, we find no evidence in the record that Mrs. Chapman consumed any intoxicants whatever prior to the accident; in fact, there is ample direct evidence that she did not. The only evidence as to Dale's consumption of any alcoholic beverage was Mrs. Chapman's testimony that he drank one bottle of beer.

The record fails to support defendant's contention that Mrs. Chapman was so fatigued at the time of the accident that she could not safely operate an automobile. Rather, it is shown that she had taken a nap during the afternoon preceding the accident and that she was not up all the night of July 4 but only occasionally in ministering to the needs of her sunburned daughters. There is absolutely no showing that Dale knew or had any reason to suspect that Mrs. Chapman had lost any sleep during the night of July 4.

Another element of the defense of contributory negligence—Dale's alleged failure to warn Mrs. Chapman of impending danger from the rear—must likewise be rejected. True it is that there was evidence to show that the direction signal lights were not functioning on the rear of the Chapman car, a fact which was known to Mrs. Chapman and one of her daughters who had earlier discovered the defect. But there is no evidence to show that Dale had any such knowledge. A guest passenger, without some reason to suspect a particular defect, has no duty to inspect the automobile before accepting an invitation to ride in it. There was testimony to the effect that Mrs. Chapman gave the extended arm signal to indicate her intention to make a left turn, but the evidence on that point was conflicting. The truck driver testified that he saw no such signal but such testimony signifies nothing in view of his admitted inability to stop the truck after he saw the car itself. There was also an insinuation by the defendant that Dale should have warned

Mrs. Chapman of the approach of the truck because of the reflection of the truck's headlights, but there is no evidence that Dale, from his position in the rear seat, did observe, or could have observed, any such reflection from the downward beam of the dimmed headlights. In Bolt v. Gibson, 225 S.C. 538, 83 S.E.2d 191 (1954), the plaintiff was riding beside her father who was driving his own automobile; the car, while stopped on a city street, was struck from the rear by defendant and plaintiff was severely injured. The court, in affirming the lower court's refusal to submit the contributory negligence issue to the jury, stated with respect to plaintiff's duty to warn her father, the driver, 83 S.E.2d at 195:

"* * * Seated as she was she was properly looking forward and not to the rear. Had she looked to the rear, and there was no occasion for her so doing, she could have done nothing to warn her father in time to prevent the collision in which she suffered the injuries. The collision occurred 'all of a sudden', according to the testimony of the appellant Gibson, and respondent was afforded no opportunity for doing anything to prevent the same."

Defendant cites a number of cases which we consider inapplicable or distinguishable. Leek v. New South Express Lines, 192 S.C. 527, 7 S.E.2d 459 (1940), and Peak v. Fripp, 195 S.C. 324, 11 S.E.2d 383 (1940), express the generally prevailing rule that circumstantial evidence may sustain a finding of negligence and that in civil cases the circumstances need not permit the drawing of one, and only one, reasonable inference in order to sustain a finding based upon one of two or more reasonably permissible inferences. In the case at bar, it was the District Judge's view, with which we agree, that there were no circumstances appearing from the evidence which could reasonably serve as the basis of a jury determination that the decedent was contributorily negligent. As has been repeatedly held, juries cannot be permitted to speculate in a void of evidence. In the Leek case, supra, a wrongful death action, the trial resulted in a verdict for plaintiff based upon circumstantial evidence of defendant's negligent conduct. The Supreme Court of South Carolina reversed and held that a verdict should have been directed for defendant because, as the court viewed the evidence, plaintiff had not sustained his burden of showing defendant's negligence. The court said, 7 S.E.2d at 462:

"The right to recover on circumstantial evidence for death resulting from another's negligence depends upon the reasonable and logical connection such proof establishes between the death and the negligent act alleged to have caused it. It is incumbent upon the plaintiff, in the absence of direct evidence, to show the existence of such circumstances as would justify the inference that the injury which caused the death was due to the wrongful act of the defendant, and not leave the question to mere speculation or conjecture. The facts and circumstances shown should be reckoned with in the light of ordinary experience and such conclusions deduced therefrom as common sense dictates. * * *

* * * * * *

"The plaintiff was bound to show something more than that the defendant was possibly responsible for the decedent's death, in order to entitle him to a verdict. The burden was upon him, in the absence of positive evidence of that fact, to show not only the existence of such possible responsibility, but proof of circumstances which would furnish a reasonable basis for the inference by the jury of the ultimate fact that the death was caused by the wrongful act of the defendant in driving its truck upon the wrong side of the road. And this, in our opinion, he has not done."

Jackson v. Jackson, 234 S.C. 291, 108 S.E.2d 86 (1959), is inapposite. There the trial court had withdrawn the con-

tributory negligence issue from the jury because of a lack of direct proof of plaintiff's negligence. Here there is no indication that the lower court eliminated the contributory negligence issue *merely* because defendant failed to introduce *direct* evidence of Mrs. Chapman's fatigue and use of intoxicants. The scintilla-evidence rule is not applied in federal courts. Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 343, 53 S.Ct. 391, 77 L.Ed. 819 (1933). There is no evidence, either direct or circumstantial, to show that the deceased failed to act as a reasonable, prudent person would have acted under the circumstances. See Funderburk v. Powell, 181 S.C. 412, 187 S.E. 742, 748–749 (1936). It would have been error for the court to permit the jury to speculatively find the decedent guilty of contributory negligence in the instant case.

■ The second question on appeal is raised by the claim of error in the District Court's charge to the jury concerning the asserted defense that the accident was the result of the sole negligence of Mrs. Chapman. Defendant requested the court to charge the jury with respect to the applicability of a South Carolina statute[2] which prohibits stopping, standing, or parking on the main-traveled part of the highway (except when a car is disabled) when it is practicable to stop on the shoulder of the highway.

The trial judge interpreted the statute to mean, and so charged the jury, that a driver could lawfully stop in his traffic lane of a highway long enough to wait for oncoming traffic to clear the opposite or left traffic lane before making a left turn. Apparently the Supreme Court of South Carolina has not ruled on this precise point, but we find the District Court's interpretation not unreasonable; the statute expressly states that the driver should not stop on the highway *"when it is practicable to stop, park or so leave such vehicle off such part of such highway."* (Emphasis added.) It cannot reasonably be contended that a driver preparing immediately to make a left turn off of a public highway can *practicably* move completely off the highway to the right to wait for all traffic to clear the roadway. Defendant argues that the court's instruction on this point had the effect of instructing the jury that the statute has no applicability here. It is suggested that the jury might have found that Mrs. Chapman had stopped on the highway and was debating whether to turn left to take Norman Harrison home. There is no evidence of any such indecision on Mrs. Chapman's part; indeed, there is ample evidence to the contrary. We perceive no error with respect to the trial judge's instruction concerning the South Carolina stopping and standing statute.[3]

2. *"Stopping, Standing and Parking.*
"§ 46–481. Outside of business or residence districts.
"Upon a highway outside of a business or residence district no person shall stop, park or leave standing any vehicle, whether attended or unattended, upon a paved or main traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of such highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway.
"This section shall not apply to the driver of any vehicle which is disabled while on the paved or main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

3. We are not unmindful of Jeffers v. Hardeman, 231 S.C. 578, 99 S.E.2d 402 (1957), cited by defendant, which discusses the applicability of the statute here in question. There, however, defendant had actually parked his car on the main-traveled portion of the highway and was standing outside the car. It was also shown that defendant there had ample opportunity to have driven onto the shoulder and so as not to block traffic. In the case at bar, there is uncontradicted testimony that Mrs. Chapman was preparing to turn left when the accident occurred and that there was insufficient room on the road shoulder to permit stopping thereon. The Jeffers case is thus clearly distinguishable.

■ Defendant's third point is that the trial judge erred when he, allegedly on eight different occasions during the trial, closing argument of counsel and in his charge, told the jurors that if they found both Mrs. Chapman and defendant's driver negligent and that such negligence by both drivers was the proximate cause of decedent's fatal injuries, they should find for plaintiff. Defendant does not challenge the correctness of the instruction but contends that Bowman was prejudiced by the needless repetition thereof. We think it unnecessary to burden this opinion with a detailed discussion of the context in which the instruction was given on each of the several occasions. Suffice it to say that it was properly given on each occasion and twice to correct a statement by defense counsel which may have misled the jury had not the judge offered the explanatory instruction. It is conceivable that emphatic repetition of an instruction might be prejudicial under certain circumstances, but prejudice to the defendant is not apparent here.

■ The fourth and final point raised by defendant is, as stated in its brief, " * * * that so much of the verdict as is for the benefit of the father of the deceased, * * * ($27,500) * * *, is excessive as a matter of law in that there was no evidence of damage and injury to the father of the deceased, from whom the mother of the deceased was divorced, and with whom the deceased had neither resided nor associated since 1944 when the deceased was four * * * years of age." Defendant points to the obvious ambiguity in the section of the South Car-

olina wrongful death statute pertaining to the distribution of damages awarded by a jury for wrongful death. That section [4] provides in part that the jury *may* determine damages proportionate to the injury of each beneficiary or distributee. However, the last sentence of the section, in apparent conflict with the immediately preceding sentence, provides that the amount recovered in an action for wrongful death is to be distributed according to the statute of distributions.[5] It appears that several states have similar statutes containing these curiously conflicting provisions. See annotations in 14 A.L.R. 516, 520 (1921); 112 A.L. R. 30, 32 (1938); and 171 A.L.R. 204, 206 (1947). The parties here are in apparent agreement that most of the state courts which have considered this situation so presented have held that the gross amount of the unlawful death award must be distributed to the proper beneficiaries under the wrongful death statute in the proportions prescribed by the applicable statute of distributions. It is urged by the defendant here that South Carolina does not follow the so-called majority rule because of the holding in Childs v. Bolton, 69 S.C. 555, 48 S.E. 618, to the effect that the statute of distributions has no application to the distribution of a wrongful death award.

In 1904, the year of Childs v. Bolton, the South Carolina statute of distributions provided that the mother took no part of the estate of her child who died intestate, unmarried and without issue unless the father predeceased the child, in which event the mother took the share of the estate which otherwise would have gone to the father. The South Caro-

---

4. Title 10, Section 1954 of the South Carolina Code of Laws 1952 provides as follows:

"Damages; amount and to whom payable.

"In every such action the jury may give such damages, including exemplary damages when such wrongful act, neglect or default was the result of recklessness, wilfulness or malice, as they may think proportioned to the injury resulting from

such death to the parties respectively for whom and for whose benefit such action shall be brought. And the amount so recovered shall be divided among the before mentioned parties in such shares as they would have been entitled to if the deceased had died intestate and the amount recovered had been personal assets of his or her estate."

5. Code of Laws of South Carolina 1952, § 19-52.

lina Supreme Court, considering the plural word "parents" and to give meaning to the word as used in the section of the wrongful death statute dealing with beneficiaries for whom the action could be maintained,[6] held that since there was no provision in the statute of distributions for proportionment between a mother and father of the intestate child, the latter statute had no application to the distribution of a wrongful death award and that the parents were entitled to share equally. However, at the time of Dale Galloway's death, the statute of distributions had been amended to provide for equal distribution of the estate between the parents of a child who died intestate, unmarried and without issue. Plaintiff argues that because of this statutory amendment the Childs case is no longer controlling authority in South Carolina and the statute of distributions would now govern the distribution of wrongful death awards.

Under the circumstances of this case and considering the fact that Dale was contributing from his earnings to the support of his mother, it is possible that the jury might have concluded that the mother would suffer greater damage from Dale's death than would the father had the question been submitted under proper instructions for jury determination. However, there was no such jury determination of damages proportioned respectively to the injury of each parent. There was no request that the jury be instructed on this point nor was there any objection to the failure of the court to charge with reference thereto.

Whether the Supreme Court of South Carolina would now depart from Childs v. Bolton in view of the amendment to the statute of distributions, we need not speculate. Under the decision of the Childs case, in which there was nothing to indicate a contrary result, the court held that the parents should share equally the fund which was created as a result of the unlawful death. If the statute of distributions were now held to be controlling, the same result would be reached *in this case*, that is, equal distribution of the award between the father and mother.

The jury could not have been expected to determine the proportionate injury of the father and mother in the absence of an appropriate instruction by the court. The record contains neither a request for such an instruction nor an objection to the failure to give it. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A., in pertinent part, provides that no party may assign as error the giving of, or the failure to give, an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects.

We conclude there is nothing in this case which commands interference with the jury verdict. It is contended that $27,500, that part of the jury verdict for the benefit of the father, is excessive. But who could say as a matter of law that this father experienced no grief, no sorrow, no wounded feelings, no mental shock and suffering, or that he would not lose future companionship as a result of his son's untimely death? These questions were for the jury to determine, and there has been no contention, nor is there anything to indicate, that the verdict of the jury was the result of mistake, caprice, passion, prejudice or was otherwise improperly motivated.

Affirmed.

6. Section 10–1952, Code of South Carolina 1952; that section is in pertinent part substantially the same as the statutory provision considered in Childs v. Bolton.