**Robert E. BURRISS, Jr., Appellee,**

v.

**TEXACO, INC., Appellant.**

**No. 10052.**

United States Court of Appeals
Fourth Circuit.

Argued Dec. 6, 1965.

Decided May 6, 1966.

---

James H. Price and William B. Price, Greenville, S. C. (Price & Poag, Greenville, S. C., on brief), for appellant.

William L. Watkins, Anderson, S. C., and David L. Freeman, Greenville, S. C. (Francis R. Fant, and Watkins, Vandiver, Kirven & Long, Anderson, S. C., on brief), for appellee.

Before SOBELOFF, BOREMAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Circuit Judge.

Judgment was entered against Texaco upon a jury verdict in the Eastern District of South Carolina for fire damage to plaintiff Burriss' feed mill. Jurisdiction was based on diversity of citizenship.

I

For more than thirty years Texaco has held a lease from the Carolina & Northwestern Railway Company on certain land in Anderson, South Carolina, used for the storage and distribution of gasoline. On the morning of February 13, 1962, a Texaco railroad tank car delivered gasoline to the storage tanks on the premises. There was evidence in the company's records from which the jury could have found that from 75 to 115 gallons of this fuel were spilled in the course of the unloading, and entered a drainage ditch on the Texaco property. The ditch sloped downhill from the Texaco tanks until it met a second ditch that crossed under the railroad yard through a junkyard, eventually discharging from a pipe directly under plaintiff's feed mill. In other words, from Texaco's storage tanks to the feed mill there was continuous downhill drainage through several interconnected ditches.

On the afternoon of the unloading of the fuel, a fire broke out in the drainage ditch at the point where it passed through the junkyard. From there the blaze spread rapidly back to the Texaco property on the high ground, and to the plaintiff's feed mill lower down. Witnesses testified that the flames leapt as high as 10 feet in the air, and firemen arriving on the scene soon after the first alarm testified that they perceived a distinct odor of gasoline. There seems little question, and the jury clearly believed, that the conflagration was in fact attributable to the ignition of gasoline in the drainage ditch system.

Since 1955, the City of Anderson has had an ordinance, modeled on the National Fire Prevention Code, requiring that separator boxes be maintained at the intersection of all public drainage ditches where flammable liquids might enter.[1] The provision was applicable to the present case,[2] but there were no separator boxes to prevent spilled gasoline from flowing off the Texaco property into the drainage system leading to plain-

---

1. "Provision shall be made to prevent flammable liquids which may be spilled at loading or unloading points from entering public sewers and drainage ditches, or natural waterways. Connections to such sewers, drains, or waterways by which flammable liquids might enter shall be provided with separator boxes or other approved means whereby such entry is precluded." Anderson City Code § 15.-406d (1955).

2. The ordinance requires separator boxes in order to prevent gasoline from flowing from one person's property to another. The "public" sewers and drainage ditches described refer to ditches *used* by the public, not merely those publicly *owned*. Moreover, from the map of the area it appears that part of the drainage system was tied in with a sewer on publicly-owned property and that the failure to provide separator boxes permitted gasoline to flow to the sewer as well as to the ditch where the fire started.

tiff's mill. Under South Carolina law, this failure to comply with a mandatory safety ordinance constitutes negligence *per se.* E. g. Lindler v. Southern Ry. Co., 84 S.C. 536, 66 S.E. 995 (1910); see A.L.I., Restatement of Torts, § 286. The District Court therefore submitted the case to the jury on a single question: whether noncompliance with the ordinance was a proximate cause of the fire and resulting damage. The jury returned a verdict of $95,000 against Texaco.

## II

Texaco argues that a consignment agreement it had with one Joe Crudup, Jr., rendered the latter an independent contractor, and immunized Texaco from responsibility for noncompliance with the ordinance. The District Judge indicated his view that even if Crudup was an independent contractor, Texaco would still be liable; but we do not reach that question since upon an examination of the undisputed facts it is clear beyond cavil that Crudup was no independent contractor but merely Texaco's agent for distribution of gasoline in the Anderson area.[3]

Under South Carolina law, the terms of a consignment agreement are not conclusive on the question of independent contractor, where there is evidence *dehors* the contract which establishes a true agency relationship.[4] The test as developed in South Carolina and other jurisdictions is whether or not the purported principal has the right to control the conduct of his alleged agent.[5] A review of the facts, undisputed on this record, shows that Texaco retained the right to control the detailed operation of the enterprise, and actively exercised it, so that Crudup was in fact merely Texaco's Anderson agent.

Crudup had worked for Texaco for 12 years before taking over the Anderson distributorship on October 1, 1961, under a consignment agreement and a simultaneous distributorship agreement drafted by Texaco. Texaco owned the storage tanks, pipe lines and other equipment used for unloading and storage of gasoline delivered in tank cars owned by Texaco. The land on which these tanks were built, held by Texaco on lease from the railroad, was not sub-leased to Crudup. The consignment agreement provided that Texaco would deliver to Crudup quantities of gasoline for sale in the Anderson area, to be sold at prices not less than Texaco's prescribed minimum. Under the distributorship agreement, Crudup was required to purchase annually no less than 284,000 gallons of gasoline, and he could not take more than 340,000 gallons.

There are some 35 Texaco service stations in the Anderson area. Each has a contract directly with Texaco, not Crudup, for the annual purchase of specified quantities of gasoline. Texaco consigned the gasoline needed to Crudup, who in turn delivered to individual retailers. Title to the gasoline remained in Texaco until delivery by Crudup to the stations.

---

3. The ordinance was introduced into evidence late in the trial, and the District Court indicated that if recovery was based on noncompliance with its terms, it would be unnecessary to show an agency between Texaco and its consignee-distributor, Joe Crudup, Jr. Plaintiff therefore relied on the ordinance rather than pressing his original theory of recovery, based on Crudup's alleged negligence during the unloading operation. This tactic clearly did not "concede" that Crudup was an independent contractor; plaintiff's counsel simply relied on the trial court's assertion that the independent contractor issue was not relevant if liability rested on noncompliance with the ordinance.

4. See, e. g., Hubbard v. Rowe, 192 S.C. 12, 17, 5 S.E.2d 187 (1939); Tate v. Claussen-Lawrence Const. Co., 168 S.C. 481, 167 S.E. 826 (1933). See also Thompson v. Ford Motor Co., 200 S.C. 393, 21 S.E. 2d 34 (1939); McNeill v. Electric Storage Battery Co., 109 S.C. 326, 96 S.E. 134 (1918).

5. See Thompson v. Ford Motor Co., supra; Tate v. Claussen-Lawrence Const. Co., supra; Gulf Refining Co. v. Brown, 93 F.2d 870, 116 A.L.R. 449 (4th Cir. 1938); Texas Co. v. Ziegler, 177 Va. 557, 14 S.E.2d 704 (1941); Wood v. Miller, 226 N.C. 567, 39 S.E.2d 608 (1946); 35 Am. Jur. 449, § 5.

Sales of this gasoline to the dealers were required to be strictly for cash, except where authorized by Texaco. All invoices to the local dealers were on Texaco, Inc., billheads and Texaco maintained a separate bank account in its name in Anderson for deposit of payments made to Crudup by the retailers. Crudup was required to account promptly to Texaco for all moneys in his possession, and he kept daily records of his operations on forms supplied by Texaco. The telephone was listed in Texaco's name, and the Texaco trademark was painted on one of the storage tanks and the warehouse. Although the Anderson license for the operation of a bulk storage plant was in Crudup's name, Texaco paid all taxes on merchandise, stock and equipment of the consignor.

Texaco reserved the right, in the event of any disputes with the consignee, to suspend shipments of gasoline until the matter was resolved to Texaco's satisfaction. Texaco could withhold any commissions due Crudup, as a charge on his indebtedness; but he was forbidden to withhold any funds as a charge against Texaco moneys. A Texaco representative visited the storage plant at least three times each month; in addition Texaco made quarterly audits of Crudup's records. The contract was not assignable, and Texaco had the right to cancel the agreement without cause, on five days notice.

Texaco furnished Crudup a manual entitled "Successful Bulk Station Operation Suggestions for Consignees," which stated in its preface that the consignee should promptly report to the company any dangerous or defective conditions in order that the company could make needed repairs and replacements. The body of the "Suggestions" lays down procedures for maintenance and operation of the distributorship, the forms and reports to be used, and the manner of extending credit and making collections on sales to Texaco service stations. Every step in the handling, storage, and unloading of gasoline was prescribed in most minute detail, even to the location of receptacles for discarded cigarettes. In view of Texaco's power to terminate the contract on five days notice, and to make thrice-monthly inspections, Crudup's testimony that he followed all the "suggestions" to the letter is not surprising.

Judge Soper's description of the consignment in Gulf Refining Co. v. Brown, 93 F.2d 870, 116 A.L.R. 449 (4th Cir. 1938), aptly portrays the relationship found here between Texaco and Crudup:

"[T]his was a consignment business so arranged as to leave little or no discretion to the consignee in the sale of the goods. His province was merely to find customers, make deliveries, and collect the money. There was some leeway in the choice and management of employees and in the amount of their salaries which the distributor was required to pay out of his commissions. But even here the company was the dominant figure. It stipulated [as did Texaco in the instant case] that the distributor carry workmen's compensation insurance * * * [a promise] quite unnecessary if it had no responsibility for their [injuries]. * * * The necessity for assistants to the distributor was inherent in the business; the selection of men resident in the locality and the supervision of their conduct [which authority Texaco similarly "granted" to Crudup] was necessarily reposed in some local representative, so that the actions of the parties would have been substantially the same if the contract had contained no clause conferring upon the distributor full control of the men he employed. The power of the company to put an end to the employment of the distributor at will rendered him at all times and in all respects subservient to its will. *The language of the contract referred to must therefore be regarded as a futile attempt to secure the benefits of complete control while repudiating its liabilities.*" Id. at 873, 875. (Emphasis added.)

█ Likewise, Crudup was simply Texaco's local distributing agent in Anderson. This is not a case in which a manufacturer in search of an outlet for his product commissions a local businessman to handle a line of goods, leaving him free to operate his business as he sees fit. By the very nature of the business and the dangerous character of the product sold, Texaco retained a high degree of control over the distribution. The relationship was exactly the same as if Texaco had retained Crudup on its payroll—although on a commission basis—and assigned him to operate its Anderson plant. The relationship was not altered by merely clothing him in the garment labelled "independent contractor." [6] Texaco, through detailed supervision of every aspect of Crudup's activities, took upon itself the responsibility for safe maintenance of the Anderson plant. It may not now escape liability for failing to comply with a safety ordinance aimed at preventing the very hazard which resulted in the destruction of plaintiff's feed mill. See Sams v. Arthur, 135 S.C. 123, 133 S.E. 205, 208 (1926.) [7]

█ Since there was no dispute as to the basic facts, there was no issue for the jury to resolve as to the relationship between Texaco and Crudup. Under these circumstances it would have been reversible error to submit the question of agency to the jury. Smith v. Lauritzen, 356 F.2d 171, 176 (3d Cir. 1966); see Walker v. United States Gypsum Co., 270 F.2d 857 (4th Cir. 1959), cert. denied, 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed. 2d 1148 (1960); Bass v. Commercial Credit Corp., 317 F.2d 910 (5th Cir. 1963); Fed.R.Civ.Proc. 56; Major v. McCurdy, 118 F.Supp. 537 (E.D.S.C. 1954) (South Carolina practice). [8] Moreover, since the ruling of the District Court eliminating the independent contractor defense from the case came at the conclusion of all the evidence, after Texaco had had a full opportunity to establish its affirmative defense, a remand for the taking of additional evidence is unnecessary. Cf. Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). We therefore conclude that the District Court properly submitted the case to the jury limited to the question whether Texaco's violation of the ordinance was a proximate cause of the fire that destroyed the plaintiff's mill.

### III

█ Texaco further complains that the evidence was insufficient to permit the jury to find that violation of the ordinance was a proximate cause of the fire. Testimony from Texaco's own witnesses indicated that after the transfer from the tank cars, there should have been a total of 13,352 gallons in the Crudup tanks; but a measurement taken by a Texaco auditor immediately after the unloading showed only 13,276 gallons.

---

6. This is reminiscent of the boy who, uninfluenced by the admiring remarks anent the King's "new clothes," exclaimed to the utter consternation of his elders that the King in fact wore no clothes at all.

7. "The reason which has supported the principle of respondeat superior, based upon the judicial interpretation and declaration of public policy, is that the principal, selecting his agent and directing the manner in which he shall execute the agency, should in justice to third persons * * * who are not responsible either for his selection or conduct, be held liable for his torts."

8. Cf. e. g., Brownlee v. Charleston Motor Express Co., 189 S.C. 204, 200 S.E. 819 (1939); Tate v. Claussen-Lawrence Const. Co., 168 S.C. 481, 167 S.E. 826 (1926); Phillips v. Davidson, 24 F.Supp. 184 (E.D.S.C.1938), where the facts bearing on the question of agency were not sufficiently developed to permit resolution of the issue by the court. Compare Hubbard v. Rowe, 192 S.C. 12, 5 S.E.2d 187 (1939), where on examination of entire record, the trial court characterized consignment as an agency. To the extent that state and federal practice might be argued to differ in this respect, of course, the federal practice would control. Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed. 2d 953 (1958); Herron v. Southern Pac. Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931), cited with approval in Byrd, supra.

This 76 gallon disparity was calculated without accounting for the temperature difference between the railroad tank cars —44° F.—and the storage tanks—48° F. Since gasoline expands when stored at a higher temperature, the actual amount of gasoline unaccounted for on the morning of the fire was therefore estimated to be almost 115 gallons. From this, a jury could reasonably infer that the missing gasoline had spilled into the drainage ditch and flowed through the system, unimpeded by reason of the absence of the legally-required separator boxes. Although circumstantial, the evidence in this civil case was plainly adequate to support the jury's finding. See Mann v. Bowman Transp., Inc., 300 F.2d 505 (4th Cir. 1962); Leek v. New South Express Lines, 192 S.C. 527, 7 S.E.2d 459 (1940).

### IV

At trial, and on appeal, Texaco objected strenuously that it was unaware of the existence of the Anderson ordinance until it was offered in evidence. The objection is without merit. Plaintiff's original complaint was apparently drawn on a theory of absolute liability and did not allege negligence.[9] Based on this complaint, Texaco conducted extensive discovery, but the ordinance was not mentioned. Then, on November 26, 1963, more than two years before the trial, the complaint was amended to include a specific allegation that Texaco had "negligently permitted [gasoline] to escape into a storm drain passing plaintiff's mill * * *." This allegation was sufficient under the rules to permit introduction of the ordinance in its support. Plaintiff was not required to allege the basis of the claimed negligence with greater particularity. Rule 8 of the Federal Rules of Civil Procedure encourages

"a short and plain statement of the claim"; details are to be developed by appropriate discovery proceedings. See Edwards v. Mazor Masterpieces, Inc., 111 U.S.App.D.C. 202, 295 F.2d 547, 549 (1961); Great Atlantic and Pacific Tea Co. v. Jones, 294 F.2d 495 (5th Cir. 1961); Official Form 9.

Although there was ample time between the filing of the amended complaint and the trial for Texaco to ascertain more precisely the grounds of the asserted negligence, no further discovery was conducted. Moreover, the District Court interrupted the trial to allow defendants additional time to conduct any desired research concerning the ordinance, but neither at the trial nor on this appeal has it shown how the final result could have been altered by earlier awareness of the ordinance.

### V

Texaco's final point is that the trial court refused to admit into evidence a model of the railroad yard prepared by a defense expert, who was allowed to express his opinion on the origin and spread of the fire, but not permitted to re-enact the fire on the model. The decision to exclude a mechanical exhibit for the purpose of conducting a courtroom experiment was within the sound discretion of the District Court, Saldania v. Atchison, T. & S. Fe R. R. Co., 241 F.2d 321 (7th Cir. 1957). Rejection of the model was particularly justified here, as the tubing used to represent the drainage pipes was admittedly not to scale, rendering the conditions of the proposed experiment substantially different from those existing at the fire. Cf. Beasley v. Ford Motor Co., 237 S.C. 506, 117 S.E.2d 863 (1963).

The judgment of the District Court is Affirmed.

---

9. The complaint merely recited that Texaco had permitted gasoline to escape from its property, and thereby caused damage to plaintiff's feed mill.