**FRITO–LAY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15962.

United States Court of Appeals
Seventh Circuit.

Nov. 7, 1967.

Thomas C. Shelton, Albert C. Tate, Jr., S. Phillip Heiner, Atlanta, Ga., for petitioner. Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, George B. Driesen, Atty., National Labor Relations Board, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Francis Flannery, Atty., N. L. R. B., for respondent.

Before MAJOR, Senior Circuit Judge, SCHNACKENBERG and SWYGERT, Circuit Judges.

MAJOR, Senior Circuit Judge.

This case is here on petition by Frito-Lay, Inc. (the Company), a nationwide manufacturer of snack food products, to review and set aside a decision and order to bargain entered November 14, 1966, by National Labor Relations Board (the Board), in an unfair labor practice proceeding under Sec. 10(f) of the National Labor Relations Act, as amended (the Act), 61 Stat. 136, 29 U.S.C.A. Sec. 151 et seq. The Board by cross petition requests enforcement of its order. 161 N.L.R.B. No. 90. No question is raised as to our jurisdiction inasmuch as the Company transacts business and operates manufacturing plants and sales offices in Wisconsin, Illinois and Indiana.

The case had its genesis in a petition filed with the Board by International Union of District 50, United Mine Workers of America (the Union), requesting certification as the bargaining repre-

sentative of certain single truck distributors of the Company's products in the Buffalo, New York, area.

The sole issue then, as now, is whether such distributors are employees within the meaning of the Act, or independent contractors. The Board's Regional Director in Buffalo, acting under the authority of Sec. 3(b) of the Act, decided the issue adversely to the Company, made findings of fact and directed an election in a unit which the Company agreed was appropriate.

The Company filed a timely request for review of the Director's decision, which the Board summarily declined by telegraphic communication which stated that the Company raised "no substantial issue warranting review." Following an election, the Union was certified by the Director as the collective bargaining representative of the distributors. The Company refused the Union's request to bargain, stating its intention to obtain a determination from the Board as to the status of its distributors.

Thereupon, the unfair labor practice complaint in the instant proceeding was issued under the authority of Sec. 10 of the Act. The Company answered the complaint, admitting the certification, but refused to bargain on the ground that the Board was without jurisdiction because the distributors were in fact independent contractors.

The General Counsel filed a motion for summary judgment, calling for application of the Board's "Rule Against Relitigation" of previously determined issues. The Company filed a response to the motion, detailing its objections to such summary procedure, and claimed its rights as an accused in an unfair labor practice proceeding to the administrative due process guaranteed by Sec. 10 of the Act and by Secs. 5, 7, 8 and 11 of the Administrative Procedures Act, as amended, 60 Stat. 237, 5 U.S.C.A. Sec. 1001 et seq.

The Board without a hearing sustained the motion for summary judgment and entered the order under attack. Neither the Board nor an independent trial examiner reviewed the evidence adduced at the representation hearing or attempted to make independent findings of fact as to the details of the relationship between the Company and the distributors, or as to any indicia of control by the Company over their method and manner of operation.

The situation is clearly portrayed by the Board's decision. Under the heading, "Findings of Fact," those not in dispute —that is, those relating to the Company's business, the labor organization involved and the unfair labor practices charged—are set forth. Relative to the issue in dispute the decision states:

"It is well settled that, in the absence of any evidence unavailable at the time of the representation proceeding or any newly discovered evidence, the Board will not reconsider in a subsequent refusal-to-bargain proceeding matters which have been disposed of in a prior, related representation case. This is equally true where the representation proceeding was processed under Section 3(b) of the Act, especially where the Board has denied a request for review of the Regional Director's decision. The Regional Director's finding in this case that the truck distributors were employees was reached after full litigation by the parties, and review was thereafter denied by the Board. * * * *It is therefore clear that, under established rules, the status of the disputed employees cannot be relitigated in the instant proceeding. Accordingly, we find, on the basis of the Regional Director's decision, that all the single truck distributors are employees within the meaning of the Act.*" (Italics supplied.)

Ordinarily, in an unfair labor practice case, the Board in support of its order relies upon its own findings. In the instant case we have something different. The Board made no findings of its own but relied upon those made by the Regional Director in the representation proceeding. In its brief, under the heading, "The Board's Findings of Fact," the Board makes a lengthy and involved

statement of facts, citing only the decision of the Regional Director and the evidence which was adduced at the representation hearing. In a footnote to its brief the Board states:

"Since the Board's order is based in part on findings made in the representation proceeding under Section 9 of the Act, the record in that proceeding is part of the record before the Court, pursuant to Section 9(d) of the Act."

The Board might have added that its order is based entirely on findings made in the representation proceeding insofar as they relate to the status of the Company's distributors.

We think the contested issues may be appropriately stated: (1) whether the Board properly found that the Company violated the Act by its admitted refusal to bargain with the certified representative of its employees, and (2) whether the Company as the party accused of an unfair labor practice has been deprived of procedural due process by reason of the Board's resort to its "Rule Against Relitigation," thereby denying the Company the right to a hearing on the substantive issue involved.

A resolution of the first issue depends upon whether the distributors were employees within the meaning of the Act as found by the Regional Director, or independent contractors as urged by the Company. If this issue is decided in favor of the Company, there will be no occasion to discuss or decide the procedural issue raised by it.

The Company is a Delaware corporation, engaged in the manufacture and sale of potato chips, corn chips and other snack foods throughout the United States. The Company's two sales districts and warehouse located in the area of Buffalo, New York, are its only facilities involved in this proceeding. In the Buffalo area the Company distributes its products and other products which it handles exclusively through the use of approximately 24 single truck distributors. This distribution method had been in effect in the Buffalo area for 33 years prior to the representation hearing, although the operation was not acquired by the present company until 1960. The Board contends, based upon a decision of its Regional Director, that these distributors are employees, and not independent contractors as urged by the Company.

It is difficult to make a statement of relevant facts fair to all parties. In addition to the decision of the Regional Director, upon which the Board stakes its entire case, the Company on brief makes an 8-page statement of the evidentiary facts. The Board on its brief does not object to any statement of fact in the Company's brief, but instead submits a "Counterstatement of the Case," which contains another 8-page summary of the same evidence. However, our task in this respect is considerably aided by the frank concessions made in the Board's argument, subsequently set forth.

The Regional Director states in his decision:

"All distributors own their own trucks; finance their trucks independently of the Employer; insure their trucks on individual policies; pay all costs for gas, oil and maintenance of their vehicles; have their personal telephone numbers on the trucks; have their own bank accounts; file individual income tax returns, and in so doing sometimes retain accountants to assist in the preparation of said returns; determine the quantity of products to be ordered and sold; determine the order of route stops; determine the number of days and the hours in a given day to be spent working; have the same mode of compensation; and may hire helpers at their own discretion. The Employer does not pay workmen's compensation, unemployment insurance, social security, or withhold taxes for the distributors.

"The Employer does not require a minimum insurance, although it reimburses distributors for 25% of the cost

of their liability and property damage insurance. The distributors may use their trucks as they see fit; however, for the most part, their trucks are used exclusively to service their routes. The distributors' trucks are all painted in standard colors with the exception of two new trucks, and these vehicles also contain the Employer's decal. The painting and lettering of the decal is provided by the Employer at no cost to the distributor. The Employer, in writing, directs distributors to keep their trucks in a good state of repair, on the premise that a truck that is not fit reflects upon the products sold, other distributors, and the business. The Employer requires the distributors to submit all customer route cards to it every three months. It also suggests that all distributors call the warehouse each day and this is done primarily for the purpose of handling orders and specials. If the distributor obtains a new account or loses an account, the Employer directs him to mail in sales tickets so that the Employer may follow up on the account. If a distributor who owns his route decides to sell the route, he may do so subject to the Employer's approval of the purchaser. If a distributor decides to furnish promotional items such as ball point pens to customers, he does so at his own expense. Pens furnished to customers by some distributors contain the name of the distributor, the words 'Frito-Lay Distributor', and personal telephone numbers."

The Regional Director, after having found that 19 of the 24 distributors involved "own their own routes," as well as "their own trucks," with all the prerogatives that go with ownership, reached the conclusion, "The distributors herein do not have a proprietary interest in their routes, and cannot dispose of them without the Employer's approval of the purchaser." In our view, this conclusion is wholly without support from either an evidentiary or legal standpoint. The Board does not contend to the contrary but instead feebly suggests in a footnote that the finding was based upon the Regional Director's recognition of the "underlying legal and economic realities."

Obviously, the chief concern of the Company as well as the distributors was in the end result, that is, the sale by the distributors of the products which they had purchased from the Company. This must be so because the well-being of the Company depended entirely upon the sales volume. Likewise, the distributors received no wages but were dependent entirely upon profits derived from the sale of products which they had purchased from the Company.

We think one of the fallacies of the case is the Regional Director's failure to distinguish between activities of the Company which related to the manner and means by which the result produced by the distributors was to be accomplished and those which related to the result itself. Illustrative is the following statement in his decision:

"The Employer schedules and conducts sales meetings with the distributors for the purpose of promoting sales and announcing specials. In addition, Employer representatives accompany distributors on their routes to assist in sales,[1] offer suggestions in promotion, and make the available advertising materials. These services are provided to the distributors without cost. On occasion the Employer has

1. Without explanation, this statement is highly misleading. A distributor and Union witness testified:

"Q. How often does someone from a Company ride on your truck, if at all.

A. It's been a long long time since anyone from the Company rode on my truck.

Q. More than a year?

A. Much more than a year.

Q. More than five years?

A. I think it's probably five years ago."

Another distributor testified that Company personnel accompanied him "Maybe a couple, three times a year, probably," and that this occurred only when the witness "would specifically ask for help."

directed the distributors to help install promotional displays."

Further relative to the factual situation, the Board on brief states:

"There are, of course, indicia of independent contractor status in the record. Thus, the distributors are not required to keep any special hours; the Company does not withhold or deduct taxes or pay workmen's compensation on behalf of the distributors; and the distributors have, on occasion, departed from the 'suggested' wholesale prices. They do own and pay virtually all the cost of their own trucks, and their compensation depends upon the volume of their sales. See generally Br. for Pet., p. 31."

We assume that the Board is not in disagreement with petitioner's (the Company's) statement on the page thus referred to. The statement (omitting record citations and footnotes) is as follows:

"Unlike many such persons, the distributors whose status is here in question, not only own their own trucks which have been purchased without assistance or direction from the Company, but they own an actual proprietary interest in their territories which the Company recognizes in seeking territory revisions or in the event the distributor terminates or decides to sell his franchise. Nine of the twenty-three maintain their own separate warehouses. All of them buy at the Company's prices but resell (except to chain stores) at prices they themselves set to customers of their own choice within their respective territories. They decide when and in what order and with what frequency their customers will be serviced if at all. They decide the number of hours they will work in each day and the number of days they will work in a week and whether or not to hire helpers for assistance. They pay all their expenses, take the risk of earning no profits, enjoy no earning guarantee, keep their own bank accounts and business rec-

ords, and employ accountants to prepare self-employed person's income tax and social security returns. They do not participate in any of the pension, health and accident, or life insurance programs which the Company makes available to its employees. Their contacts with the Company's representatives are minimal; sales meetings are used generally to explain the Company's sales promotion and advertising plans, whereas occasional route riding by district sales managers involve actual assistance and suggestions for increasing sales. Attendance at sales meetings and permitting managers to ride the routes is at the distributor's option."

In the face of these concededly positive and concrete factors demonstrating the independent contractor status of the drivers, the Board attempts to justify the contrary result on negative factors, that is, what the record fails to show rather than what it does. Following the quotation lastly made from the Board's brief, it continues:

"But more significant are the absence of factors demonstrating independent contractor status. For example, except for one distributor who used his son as a helper, the record does not show that a single distributor regularly employs any other person to make sales. Compare, H.Rep. No. 245, 80th Cong., 1st Sess. 18 (1947), 1 Leg.Hist. of the Labor Management Relations Act (1947), 309 (independent contractors usually hire others to do the work)."

The citation is a report of the House Committee which recommended adoption of Sec. 2(3) of the Act, in which it was stated:

"In the law, there always has been a difference, and a big difference, between 'employees' and 'independent contractors'. 'Employees' work for wages or salaries under direct supervision. 'Independent contractors' undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but

upon the difference between what they pay for goods, materials, and labor and what they receive for the end result. That is, upon profits."

■ There is nothing in this report which furnishes any support to the Board's position unless it be the statement that independent contractors "usually hire others to do the work." In this connection it must be kept in mind, as previously noted, that the Regional Director found that the distributors "may hire helpers at their own discretion." We reject the theory that a person otherwise shown to be an independent contractor, especially one with the discretion to hire helpers or others to do his work, can be stripped of that status merely because he chooses to do it himself.

It is conceded that the distributors do not work for wages or salaries, and it is plain that they are without significant supervision. They decide how their work will be done and their profits depend entirely upon the difference between the purchase and selling price of the Company's products.

The Board on brief continues:

"No distributor, so far as the record shows, has ever built a route up to such an extent that he purchased a second truck and hired a driver, as one would expect an independent contractor to do."

Who, if anybody, would indulge in such expectation we are not advised. In our view, it is irrelevant whether a distributor operates his route with one truck or two, and, as noted, whether he does the work himself or hires others to aid him.

The Board further continues:

"Furthermore, as the Regional Director found, petitioner's control over the prices distributors pay and, in many instances, at which they sell, its willingness to take back stale and broken products and its acceptance of charge slips from chain stores minimize the distributor's risks and independence."

We confess our inability to discern how this statement is of benefit to the Board's position. Obviously, the Company fixed the price on its merchandise sold to the distributors. So far as we are aware, that is the ordinary and usual manner of doing business. True, the Company furnished the distributors with a price list which it "hoped" they would follow, but the record is clear that they were not obligated to do so and oftentimes did not. The record discloses that the Company had some special arrangement with chain stores by which it expressed a willingness to replace stale and broken products and to accept charge slips from such stores, but it is not shown how this enhanced the Company's control over the distributors. It evidently was an inducement to the chain stores to purchase the Company's products from its distributor, and thereby aided the result which they were able to achieve.

■ The sole issue for decision is whether the record when considered as a whole furnishes substantial support for the Board's finding that the distributors in question were employees. After a careful consideration of the record, we reach the definite conclusion that the Board's findings must be rejected. This is not to say there is no evidence which points to an employer-employee relationship, but such as there is cannot properly be termed substantial when viewed in the light of the overwhelming proof which, in our judgment, points unerringly and certainly to the status of the distributors as independent contractors.

We think no good purpose could be served in citing or discussing more than a few of the cases called to our attention. Certainly that is so as to the cases cited by the Board for the proposition that an employer who refuses to bargain with a properly certified union violates the Act. That issue is not in dispute.

The same can be said for the Board's cases which held that the Board's determination that an employer-employee relationship exists in a given situation is a finding of fact which is conclusive if supported by substantial evidence. Moreover, this Court in the recent case of United Insurance Co. of America v. N.L.

R.B., 7 Cir., 371 F.2d 316, 321, stated and discussed the principles governing review of the Board's findings and there is no reason to retread the ground which was adequately covered in that case.

Neither do we think there is any serious controversy as to the test to be applied in making a determination of the status of the distributors involved. Courts have generally applied the test outlined by the Board in Pure Seal Dairy Co., 135 N.L.R.B. 76, 79, as follows:

"In determining the status of persons alleged to be independent contractors, the Act requires the application of the 'right to control' test. Where the person for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished, the relationship is one of employment. On the other hand, where control is reserved only as to the result sought, the relationship is that of independent contractor. The resolution of this question depends upon the facts of each case and no one factor is determinative."

In that case the Board applied the test thus stated and decided that the distributors there involved, under circumstances quite similar to those here, were independent contractors and not employees. The Company places much stress on that decision and compares in detail the factors there involved with those here. The Board makes no complaint of the comparison thus made; in fact, it does not even mention the case. The Company on brief states:

"(1) As here, they purchased goods from Pure Seal at a price determined by it and resold them at prices set by each distributor in his discretion.

(2) As here, their earnings were the difference between the amount they paid for the goods and the amount they received from sales.

(3) As here, they provided their own trucks.

(4) As here, they were free to work their routes as they wished.

(5) As here, they paid the cost of license fees, liability insurance and maintenance work.

(6) As here, they garaged their trucks where they pleased and were free to use them for any purpose.

(7) As here, they were not required to wear uniforms.

(8) As here, they were free to distribute products not manufactured by the employer.

(9) As here, they hired their own helpers. [Here it would be more accurate to state that the distributors had the authority to hire their own helpers.]

(10) As here, they could extend credit to customers without approval by the Company.

\*  \*  \*  \*  \*  \*

(12) As here, they were not subject to tax deductions, workmen's compensation or training or supervision on the route by the employer."

Three cases of this Court are called to our attention, in which we reviewed the Board's determination that persons involved were employees and not independent contractors. N.L.R.B. v. Phoenix Mut. Life Ins. Co., 7 Cir., 167 F.2d 983, 986, 6 A.L.R.2d 408; National Van Lines, Inc. v. N.L.R.B., 7 Cir., 273 F.2d 402, 404–405, and United Insurance Co. of America v. N.L.R.B., 7 Cir., 371 F.2d 316, 321.

In Phoenix Mut. Life Ins. Co., we affirmed the Board's determination that the persons involved were employees and not independent contractors. The factors there, however, were in marked contrast to those here, as shown by a brief statement from the opinion (167 F.2d page 986):

"In the case at bar the respondent provides headquarters for its salesmen and furnishes each of them with office space, a desk, a telephone, stenographic service, stationery, postage, filing cabinets, sales supplies, and business cards. It also pays for the indemnity bonds and license fees which the

State of Illinois requires of each insurance agent. Each salesman is required to devote his full time to respondent's business and may not assign his contract, nor employ anyone to work under him."

In National Van Lines, Inc., the question for decision was the same as that here, that is, whether the contract-drivers were employees or independent contractors. This Court held that they were independent contractors, thereby rejecting a contrary finding by the Board. The Company at considerable length compares the factual situation in that case with that here and asserts that the circumstances there show more indicia of control over the manner and means of operation than those here. We agree with the Company's contention that the facts here are more favorable to the Company than they were there. The Board in its brief here takes no exception, in fact makes no comment, upon the Company's appraisement of the facts in National Van Lines, Inc. and its comparison of such facts with those here.

In United Insurance Co. of America, this Court held that debit insurance agents of United were independent contractors, not subject to the provisions of the Act. In doing so, we held that the Board's contrary finding was not supported by substantial evidence on the record considered as a whole. The Company here contends that its distributors are subject to less control over the manner and means of carrying on their business than were the agents of United. The Board takes no issue with this assertion and in its only reference to the case states:

"Insofar as petitioner relies upon factual similarities between this case and United Ins. Co., supra, we respectfully note the Board's disagreement with that decision. The Board has petitioned for a writ of certiorari to review that case on the ground that, *inter alia,* this Court overstepped the proper bounds of judicial review."

The fact that the Board has petitioned for a writ of certiorari does not affect our conclusion here. Neither do we need to speculate on what the ultimate decision may be in that case because it is not discernible how a decision in favor of the Board would be controlling here, where we think the facts are stronger against the Board.

We think we need go no further in comparing the facts of other cases relied upon by the Company. We recognize, of course, that the factors involved in other cases are not conclusive here because each case is dependent upon its own facts. We think such comparisons as we have made, however, are relevant because they buttress the conclusion we have reached.

The Company's petition to review and set aside the Board's order is granted and, consequently, the latter's request for enforcement of its order is denied.