**AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, LOCAL NO. 364, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 24591.**

United States Court of Appeals, Ninth Circuit.

Dec. 16, 1970.

Don Carroll (argued), Charles P. Scully, San Francisco, Cal., for petitioner.

Herman Levy (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, Wash-

ington, D. C., Roy O. Hoffman, Director, NLRB, San Francisco, Cal., for respondent.

Before HAMLEY and DUNIWAY, Circuit Judges, and SWEIGERT, District Judge.*

HAMLEY, Circuit Judge:

This is a proceeding to review a decision and order of the National Labor Relations Board (Board) based on charges by a union that an employer had engaged in certain unfair labor practices. The union, which is the petitioner in this court, is the Amalgamated Meat Cutters and Butcher Workmen of North America, Local 364, AFL-CIO (Union). The employer is Point St. George Fisheries, Inc. (Employer). We have jurisdiction under section 10(f) of the National Labor Relations Act (Act), 29 U.S.C. § 160(f).

Based up on charges filed by the Union, the Board's regional director issued a complaint alleging the Employer engaged in the following unfair labor practices, in violation of section 8(a) (1) and (3) of the Act, 29 U.S.C. § 158(a) (1) and (3): (1) discharging four employees because of their union activities; (2) engaging in surveillance of employees' union activities on specified dates; and (3) interrogating employees on specified dates concerning their union activities or sympathies.

At the hearing before the Board's trial examiner, the allegations of surveillance were dismissed at the close of the General Counsel's case. This was done on the motion of the Employer on the ground of insufficient evidence. After the close of the hearing, the trial examiner found that the four employees were discharged because their seasonal employment had come to its normal end, and not because they had engaged in union or protected activites. The trial examiner also found that the alleged un-

lawful interrogation did not in fact occur.

The trial examiner therefore dismissed the complaint in its entirety and, upon review, the Board adopted the findings and conclusions of the trial examiner. The Board's decision and order are reported in 177 N.L.R.B. No. 10.

The Union here urges that the Board's decision and order should be set aside because the findings of fact and conclusions of law are not supported by the record, and because the Union was denied a fair and impartial hearing before the trial examiner.

In complaining of the Employer's alleged surveillance and interrogation activities, the regional director invoked section 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1). This statute provides that it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of the Act, 29 U.S.C. § 157. Section 7 provides that employees shall have the right to engage in union and other concerted activity.

█ In order for an employer's interrogation of employees to constitute unfair labor practices under section 8(a) (1) it must be associated with express or implied threats or promises, or form part of an overall pattern tending to restrain or coerce employees with regard to their protected activities. N.L.R.B. v. McCatron, 216 F.2d 212, 216 (9th Cir. 1954). When the inquiries are not undertaken in a threatening manner but are only isolated instances free of coercion and without any systematic intimidation in the background, they are not unlawful. Beaver Valley Canning Co. v. N.L.R.B., 332 F.2d 429, 433 (8th Cir. 1964).

█ Neither the trial examiner nor the Board found a violation of section 8(a) (1) in the questions posed by the plant manager, or the way in which he

---

* The Honorable William T. Sweigert, United States District Judge for the North-  ern District of California, sitting by designation.

posed them. We agree. The interrogation was not conducted in a threatening manner and constituted only isolated instances of employer inquiry. There was no showing of surveillance of union activity.

With respect to the alleged discriminatory discharges, the complaint invokes section 8(a) (3) of the Act, 29 U.S.C. § 158(a) (3). This statute, with exceptions not here relevant, makes it an unfair labor practice for an employer to encourage or discourage membership in any labor organization by discrimination in regard to hiring or tenure of employment or any term or condition of employment.

We summarize the facts relevant to the discharges here in question. The Employer was engaged in the business of processing and canning fish. This is a seasonal business. The trial examiner found that employees here involved, Ernest Robinett, Larry Cherney, Richard Wallis and Gerald Wallis, were employed on a seasonal basis. In our opinion this finding has substantial support in the record. The Employer did retain a few men as permanent year-round employees. When the complained-of discharges occurred, the crab processing season was coming to a close.

The Union began an organizing campaign during March 1967. The plant manager, Joseph Davi, became aware of the Union's activity when an employee, Frank Maniscalso told Davi that a union organizer had called on Maniscalso at his home and had left an authorization card. Davi was given the card by Maniscalso. In a telephone call to a Union officer on March 29, Davi was quite critical of the Union's efforts.

The testimony of the plant manager, which the trial examiner credited, was that Larry Cherney and Richard Wallis were terminated because there was no more work for them to perform. During the crab season employment reached approximately 125–135 females and twenty to twenty-five males. When Cherney and Richard Wallis were terminated, employment had shrunk to approximately twenty-five or thirty females and seven males. Cherney and Richard Wallis did not sign union authorization cards until April 25, 1967, more than three weeks after they were discharged. When they were terminated there was no indication by Davi of concern for union affiliation.

The circumstances involving Ernest Robinett and Gerald Wallis are somewhat different. Testimony established that Wanda Robinett, Ernest's wife, had called Joseph Davi shortly after Robinett had begun work in February 1967. According to Mrs. Robinett, she called once to inquire as to her husband's check. At that time the Robinetts were experiencing certain marital difficulties. Davi testified that she had called for such purpose several times.

Two days prior to the day Robinett and Gerald Wallis were terminated, a Union organizer visited the Robinett home. Mrs. Robinett called Davi informing him of the visit and inquiring as to what should be done. Davi replied that one could join a union, or decline to join, depending upon one's wishes. Davi also told her that if she did not want the Union organizer in the house she could have him thrown out if he declined to leave upon request.

The next morning at work Davi inquired of Robinett and Gerald Wallis, "How did you make out, boys?" They were standing together at the time clock when the inquiry was made. Both replied to the effect that they had not signed an authorization card nor joined the Union.

The following day, just prior to the noon break, Mrs. Robinett drove to the plant, as was her custom, to pick up Robinett for lunch. Davi inquired of her as to how she had gotten along with the Union organizer. According to Davi, she responded that Robinett and Gerald Wallis had signed a paper acknowledging that the organizer had called on them, so he could show the Union he was doing organizational work.

Then, according to Davi, without provocation, Mrs. Robinett accused Davi of spreading rumors about the Robinetts' marital status. Mrs. Robinett also accused Davi of certain indiscretions. As a result, Davi became angry and this caused him to discharge Mrs. Robinett's husband and Gerald Wallis. After informing them that they were terminated, Davi inquired of each as to whether either had signed an authorization card. Robinett answered yes. This prompted Davi's rejoinder " * * * isn't there anybody that will tell the truth any more?"

The Board found Cherney and Richard Wallis were terminated because there was no more work to be done. Davi had so testified. The Board found that Davi fired Robinett and Gerald Wallis because he had become so angry at Mrs. Robinett that he fired Robinett and the person most closely associated with him.[1]

The decisive question in a case such as this is whether the motive of the employer in discharging the employee was related to the employee's protected activity. The employer may terminate an employee for no reason or for any reason other than union or other protected activity. Associated Press v. N.L.R.B., 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953 (1937); R. J. Lison Co. v. N.L.R.B., 379 F.2d 814, 817 (9th Cir. 1967). The Board here credited Davi's testimony and declined to infer an improper motive in the employer. When there is conflicting testimony and the Board has determined which is credible, we have no basis for rejecting that determination, even though we might have found differently in the first instance. N.L.R.B. v. Miller Redwood Co., 407 F.2d 1366, 1369–1370 (9th Cir. 1969).

We conclude that there is substantial evidence in the record considered as a whole to support the Board's findings that the discharge of the four employees

did not constitute an unfair labor practice.

 The Union contends a fair hearing was denied by the trial examiner because he was biased and evidenced this bias throughout the proceedings. We have reviewed the entire record. While there are instances in which the trial examiner exhibited impatience and made intemperate observations, we conclude that considering the proceeding as a whole, petitioner had a fair and adequate hearing.

Affirmed.

---

1. Davi testified that he fired Robinett because he was angry with Mrs. Robinett, and he fired Gerald Wallis because he lived next door to Robinett and often rode to work with him. Davi reasoned that, having fired Robinett, Wallis would have no way to get to work, as his own car was seldom operable.