Pell, Circuit Judge, dissented and filed opinion.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

Philip David SACHS et al., Respondents.

No. 73–1456.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1974.

Decided Oct. 10, 1974.

Elliott Moore, Acting Asst. Gen. Counsel, Morton Namrow, Atty., NLRB, Washington, D. C., for petitioner.

Sam Pessin, Stephen M. Kernan, Belleville, Ill., for respondents.

Before PELL, STEVENS and SPRECHER, Circuit Judges.

PER CURIAM.

In its order of October 19, 1972, and supplemental order of March 7, 1973, the NLRB determined that Peko Ltd. (Peko), Sav-Co., Inc. d/b/a Sav-Mart (Sav-Co.) and Philip Sachs and Michael Sachs d/b/a Phil's Sav-Mart Service (Phil's) had violated §§ 8(a)(1) & (3) of the National Labor Relations Act, 29 U. S.C. §§ 158(a)(1) & (3). See 199 NLRB No. 96; 202 NLRB No. 48. The Board's determination was based upon its findings that respondents had coercively interrogated an employee concerning his union membership, instituted more onerous work rules in retaliation for the employees' union activities and discriminatorily laid off four employees. Pursuant to § 10(e) of the Act, 29 U.S. C. § 160(e), the Board has applied to this court for enforcement of its orders. We enforce as modified.

I.

Phil's is a relatively small service station located in Collinsville, Illinois. It was the "management" of Phil's, i. e., the Sachs brothers, who actually imposed the "more arduous" working conditions and laid off the four service attendants. Peko and Sav-Co.[1] thus contend that the Sachs brothers were independent contractors and that they are not responsible for the brothers' labor practices. The administrative law judge agreed with this contention, but the Board reversed, concluding that the brothers were agents of Peko and Sav-Co. and not independent contractors. See App. 8 & n. 6. If the record as a whole contains substantial evidence supporting the Board's conclusion, it must, of course, be upheld.

A.

The record demonstrates that Sav-Co. owns a building in Collinsville which is operated as a retail discount department store under the name "Sav-Mart." All of the departments within the store and the automotive store (located in a nearby building) are managed by enterprises

1. There is no contention on appeal that Peko and Sav-Co. should be treated as separate entities. Moreover, the administrative law judge found that Peko and Sav-Co. "are so integrated in ownership, management and operation that they comprise a single identity for purposes of the Act." App. 15. The Board adopted this finding, "[n]oting the absence of any exceptions" to it. App. 3.

other than Sav-Co. pursuant to lease or license agreements. Sav-Co., however, coordinates all of their advertising, furnishes building maintenance and provides utility, guard, custodial and check cashing protection services. According to the administrative law judge, the entire enterprise "gives the appearance of being a single department store." App. 12.

Located in one corner of the parking area surrounding Sav-Mart is the retail gasoline station which eventually became "Phil's." The station was constructed jointly by Sav-Co. and Mid West Petroleum Co. in 1967 and then leased to Mid West; the lease was assigned to Peko on January 2, 1968.

On the same day Peko entered into a written contract with Ben Sachs, the father of the Sachs brothers. In consideration of a $100 per week salary, Ben Sachs agreed to: 1) "supervise" the Peko stations located at the four Sav-Mart locations; 2) "advise" Peko "of the condition of the repair of its equipment and machinery and the condition of the gas service stations, the conduct and manner of operation of said service stations by the personnel operating the same and also as to the quantity, quality and types of the various products sold at said stations"; 3) "advise" Peko "as to the need for and make recommendations to [Peko] as to changing of equipment and/or products and keep [Peko] informed as to all trends and developments in the trade and business"; and 4) "make all necessary recommendations to the operators of the various stations supplied by Peko concerning their handling of credit cards and cash collection systems together with payment of accounts due from the operators to [Peko]." Ex. No. LTD–1. Although the contract referred to Ben Sachs as an "independent contractor," the Board

properly concluded that he was an agent of Peko and Sav-Co.[2]

Upon the recommendation of Ben Sachs, Peko subleased its Collinsville station to and entered into a "consignment contract" with Philip Sachs, Ben Sachs' eldest son. Pursuant to the sublease, Ex. No. GC–4, Phil Sachs was required, *inter alia*, to: 1) pay a rental of $500 per month or one cent per gallon of gasoline sold, whichever was greater; 2) maintain the station in good repair; 3) paint the station whenever Sav-Co. "deemed necessary"; 4) keep "the outside area of said premises in a neat condition and free of any objectionable debris, and reasonably free of snow, ice and water"; 5) refrain from erecting certain types of advertising and making certain alterations to the property without written consent; 6) indemnify Sav-Co. against certain claims; 7) give a two cent per gallon discount to "members of Sav-Mart"; 8) allow Sav-Co. to inspect all of its records upon demand; 9) "use reasonable diligence in the courteous and efficient sale and dispersing of products for sale on said premises with sufficient capable personnel"; 10) have a sufficient reserve supply of products to reasonably fill demands therefor"; 11) "have said station open for business daily from at least 6 A.M. each morning until at least 11 P.M. each night"; 12) "have sufficient number of pumps of recent design to properly service the reasonably foreseeable demand"; and 13) refrain from doing anything "which might in any way damage or injure the credit and/or business reputation of Sav-Mart." Failure to perform any of these requirements would, of course, allow Sav-Co. to terminate the lease.

Pursuant to the consignment contract, Ex. No. GC–5, Philip Sachs was required to: 1) sell only those products

---

2. In reaching this conclusion, the Board observed:

[T]here is no record evidence that Ben Sachs was employed by anyone else or had any other clients; that he had any capital invested in the position, any chance of

capital loss, or any chance of obtaining any profits; or that he had any other indicia of being an independent contractor. App. 7–8. The administrative law judge also indicated that Ben Sachs was an agent. App. 16.

consigned to him by Peko; 2) deposit all receipts in a bank account insured by FDIC; 3) "render diligent and courteous service to the public"; 4) operate his station "in a sanitary, clean and presentable manner daily during reasonable hours"; 5) "furnish such personnel as are able to sufficiently render reasonably prompt and competent service to [his] customers"; 6) accept, maintain an accurate inventory of and remit daily reports on all products consigned; and 7) assume liability for losses due to the use of credit cards and bad checks. Once again, failure to satisfy these requirements could have resulted in termination of his lease.

The consignment contract further provided that Peko would: 1) "render merchandising management and administrative advice and assistance" to Phil Sachs; 2) "furnish such advertising and sales promotion from time to time as it deems proper"; 3) keep an account of all Sachs' sales; 4) pay all of the station's "rentals, utility bills, taxes, and all other occupational costs, other than labor and wages, and render a monthly account therefor"; 5) protect the consigned products "from harm resulting from fire, wind and storm, and from other hazards"; 6) have the rights to inventory all consigned products whenever it desired and to demand and receive compensation for any missing goods; and 7) have the right to change any of the trade names on the consigned products.

Peko compensated Phil Sachs at the rate of three cents per gallon of gasoline sold. However, in return for certain services, he was required to pay Peko four cents per gallon. (Presumably this one cent per gallon differential satisfied the rental requirement under the sublease.) Peko guaranteed Phil Sachs "profits" of $8,000 per annum. His only investment in the enterprise was $52 in petty cash.

Subsequent to signing the agreements with Peko, Phil Sachs entered the Navy and the management of the station was entrusted primarily to Sachs' brothers. On various occasions Ben Sachs came to the station and "directed" the employees "to do particular work assignments," such as "to make announcements" in the Sav-Mart store, "to clean the lot, how much gas to order." [3] App. 25–26. As one employee testified, he regarded Ben Sachs as his "boss." App. 27.

Ben Sachs played an active role in the station's labor affairs. He was responsible for the allegedly unlawful interrogation of one employee. When the union complained of another employee's (Templeman's) discharge, Ben Sachs alone met with the union's representative, Lester Baum, and said, "[I]f you say we have to put him back, we are going to put him back." App. 98. Shortly thereafter Templeman was reinstated. When the station's employees went on strike because of a contract dispute, Ben Sachs told the brothers that Peko wanted the strike settled. He, along with the brothers, met with Baum to discuss the contract. One of the brothers told Baum that there would be no discussion unless the employees left the meeting room. The agent then called a director, officer and substantial stockholder of Peko and Sav-Co., Sidney Katz. After Ben Sachs talked to Katz, the contract was signed in the employees' presence.

Peko and Sav-Co. also played an active role in the station's labor affairs. When Templeman was discharged, Baum called Katz, who then set up the meeting between Baum and Ben Sachs. When the contract dispute arose, Baum called Katz and Ben Pessin, another director, officer and substantial stockholder of Peko and substantial stockholder of Sav-Co. Pessin "assured" him that "somebody would be in the office to sign the contract . . . ." App. 101. When the Sachs

---

3. There is nothing in the record to indicate that Ben Sachs gave these directions only during the short period when none of the Sachs brothers was able to manage the station.

refused to meet in the presence of the employees, Baum once again called Katz; shortly after Ben Sachs talked to Katz, the contract was signed with the employees present. As one of the Sachs brothers testified, the decision to meet with Baum and sign the contract was made because "it was felt that Philip would not be able to keep the station if a contract had not been signed and this strike would have continued." App. 79.

### B.

■ Whether the Sachs brothers were "independent contractors" depends upon whether Peko and Sav-Co. had the right to control the way the brothers managed Phil's:

> In determining the status of persons alleged to be independent contractors, the Act requires the application of the "right to control" test. Where the person for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished, the relationship is one of employment. On the other hand, where control is reserved only as to the result sought the relationship is that of independent contractor. The resolution of this question depends upon the facts of each case and no one factor is determinative.

Frito-Lay, Inc. v. NLRB, 385 F.2d 180, 187 (7th Cir. 1967). It is, of course,

the *right* to control and not the actual exercise of that right which is the decisive element. United Insurance Co. of America v. NLRB, 304 F.2d 86, 89 (7th Cir. 1962).

■ In our opinion, the evidence detailed above provides substantial support for the Board's determination that Peko and Sav-Co. had the right to control the way the Sachs brothers managed Phil's. Indeed, the sublease and consignment contract, which covered everything from the condition, equipment and the hours of the station to the products available for sale and the number and attitude of employees, were obviously drafted with this right in mind. And the actual intervention of Ben Sachs, Sidney Katz and Ben Pessin in the station's affairs confirms the existence of this right.[4] Where petroleum companies have reserved such extensive controls, the courts have generally refused to find that the service station operators were independent contractors. *See, e. g.*, Burriss v. Texaco, Inc., 361 F.2d 169 (4th Cir. 1966); Gulf Refining Co. v. Brown, 93 F.2d 870 (4th Cir. 1938).[5]

Peko and Sav-Co. have called our attention to the Eighth Circuit's decision in Site Oil Co. of Missouri v. NLRB, 319 F.2d 86 (1963). Although we are not bound by this authority, it might be noted that the case is distinguishable. The Eighth Circuit recognized that whether

---

4. We are aware of the administrative law judge's finding that Ben Sachs acted out of a "fatherly interest." App. 16. This finding, however, was based upon Harvey Sachs' testimony; Ben Sachs was never called as a witness. Harvey testified simply that, during the short period when it was impossible for any of the brothers to manage the station, Ben Sachs managed it "solely as a father-son relationship." Tr. 134. There is no testimony that Ben Sachs gave orders to the employees and intervened in the station's labor affairs solely during this period. Furthermore, in light of the terms of the sublease and consignment contract and the activities of Sidney Katz and Ben Pessin, the Board could properly infer that Ben Sachs acted pursuant to his contractual duty "to supervise" Phil's.

Peko and Sav-Co. also contend that Katz and Pessin acted out of a concern for the

effects of a picketline on Sav-Mart. Br. at 16–17. The agreements with Phil Sachs, however, gave them the right to terminate his lease if he did anything "which might in any way damage or injure the credit and/or business reputation of Sav-Mart." Ex. No. GC-4. Given this concern and this power, the Board could properly infer that Katz' and Pessin's activities were manifestations of their right to control.

5. Respondents contend that such cases, which generally involve tort liability, have no applicability in the labor context. In each case, however, the court considered the common law test of agency. Congress has made clear that this same test is utilized in cases arising under the National Labor Relations Act. NLRB v. United Insurance Co. of America, 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083.

substantial evidence supported the Board's determination that the station operator did not occupy the status of independent contractor was a close question. It was persuaded, however, by the existence of facts which clearly are not present in this case.[6]

The only objection which has been raised to the Board's determinations concerning the "more arduous" working conditions and discriminatory lay-offs is the lack of responsibility of Peko and Sav-Co. Since there is no other objection, we will enforce that part of the Board's order dealing with these violations. *See* NLRB v. National Mineral Co., 134 F.2d 424, 425–426 (7th Cir. 1943), cert. denied, 320 U.S. 753, 64 S. Ct. 58, 88 L.Ed. 448; *cf.* NLRB v. Ochoa Fertilizer Co., 368 U.S. 318, 322–323, 82 S.Ct. 344, 7 L.Ed.2d 312.

## II.

On October 2 or 3, 1971, Harvey Sachs discharged one of the station's four part-time employees, David Templeman, allegedly because of excessive shortages in his accounts. At the union's demand,[7] however, Templeman was reinstated. On October 4, 1971, when Gary Waligorski, another employee, arrived at the station for his shift, Ben and Harvey Sachs told him that he was laid off because they had to reinstate Templeman.[8] Waligorski then went into the back room of the station to collect his belongings. Ben and Harvey Sachs followed Waligorski and a conversation ensued:

Q. What did he [Ben Sachs] state to you [Waligorski], again, so we might have everything clear on the record?

A. "Who made you join the union?"

Q. And you answered?

A. "No one made me join the union, it was under by free will."

Q. . . . What did he state then?

A. . . . He said, "Speaking friends to friends, why did you join the union?"

Q. Did you make any response to this?

A. Yes, I said, "The union has more to offer, the only way I would get anything would be through the union."

Q. What happened then?

A. Then he said, "Look where the union got you, you have a $25 initiation fee and you are out of a job."

Q. Did you make any response to this?

A. I said I had another job lined up.

Q. What happened then?

A. I gathered my stuff and I left.

Tr. 31–32. The administrative law judge concluded that the questioning of Waligorski violated § 8(a)(1) of the

---

6. For example, the court noted that: 1) the oil company "neither exercised nor purported to exercise control over the lessee's day-to-day operations, inasmuch as [the company's] district supervisor visited the station only once every two weeks, and then primarily for the purpose of taking orders for products and distributing promotional materials"; 2) "the lessee was under *no obligation* to adhere to [the company's] suggestions as to service policy"; 3) the lessee "determined the personnel needs of the station, hired and discharged employees, and set the employees' wages and hours, *all* without consulting [the company]"; 4) the lessee, and not the company, "ran the risk of operational losses and would benefit from operational profits"; and 5) "whether, and the extent to which, the station was operated at a profit or a loss depended on the amount of capital which the lessee had to invest in additional income-producing items, and on the lessee's ability to minimize his operating costs and to maximize his sales of other products, as well as [the company's]." 319 F.2d at 89 (emphasis added).

7. The Sachs apparently were unaware of the employees' unionization until Templeman's discharge. When the union demanded Templeman's reinstatement, it also demanded for the first time that a contract be signed.

8. There is no contention that Waligorski was laid off in violation of the Act. He apparently was reinstated on October 5.

Act, 29 U.S.C. § 158(a)(1), and the Board affirmed.

We do not believe that Sachs' questioning of Waligorski concerning his motivation for joining the union constitutes a violation of § 8(a)(1). In NLRB v. Associated Dry Goods Corp., 209 F.2d 593, 595 (1954), the Second Circuit correctly concluded that such innocuous questions are improper only if they could reasonably be interpreted as containing a threat of reprisal or force or promise of benefit. *Cf.* 29 U.S.C. § 158(c); NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L. Ed.2d 547; Utrad Corp. v. NLRB, 454 F.2d 520, 525 (7th Cir. 1971); Amalgamated Meat Cutters v. NLRB, 435 F. 2d 668, 669 (9th Cir. 1970). There is nothing in the record to indicate that Sachs' isolated, informal and brief questioning, which came after the employees had already unionized, could be so interpreted.[9] Indeed, Waligorski never testified that the "interrogation" had any effect whatsoever upon him. And, since shortly after the "interrogation" Waligorski and the other three employees protested Phil's failure to sign the union contract by going on strike, such an effect can hardly be presumed.

Sachs' statement that "Look where the union got you, you have a $25 initiation fee and you are out of a job" also is not violative of § 8(a)(1). The administrative law judge apparently concluded that Waligorski was being told that "he had been laid off because of his Union membership . . . ." App. 31. Waligorski, however, testified that, when he arrived at the station,

> Ben Sachs said that they have to take Dave [Templeman] back on days again and . . . I asked "What are my hours?" and Harvey said, "You don't have any hours."

Tr. 30. When both of Ben Sachs' statements to Waligorski are considered, it is clear that he was not being told that his union activity resulted in his discharge. Sachs' latter statement was merely a summary of what had happened.[10] There is nothing in Waligorski's testimony to indicate that he thought otherwise. Nor is there any contention that laying off Waligorski was in any way violative of the Act.

■ In sum, we do not believe that substantial evidence supports the Board's determination that there was an unlawful interrogation. Accordingly, we decline to enforce paragraph 1(b) of the Board's order. The Board has argued that, since only Peko and Sav-Co. have challenged its orders in this court, it is entitled to complete enforcement against Phil's. However, as the Board determined, Phil's, Peko and Sav-Mart constituted an integrated enterprise and must be treated jointly.

With the exception of paragraph 1(b), the Board's order is enforced.

PELL, Circuit Judge (dissenting).

When these proceedings were first before the trial examiner he issued his decision after a careful and thorough analysis of the evidence. Upon that basis he found that Ben Sachs and Philip Sachs were independent contractors and that the service station in question was not part of the integrated Sav-Mart enterprise of Sav-Co. and Peko Ltd.

I agree with the trial examiner's appraisal of the evidence and the result he reached and would therefore deny enforcement of the Board's order as to Sav-Co. and Peko Ltd. I accordingly respectfully dissent.

9. As this court stated in Utrad Corp. v. NLRB, 454 F.2d 520, 524 (7th Cir. 1971): "[A]n interrogation not coercive in itself 'does not become coercive because the employer is guilty of other unfair practices.'"

10. *Cf.* NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (An employer "may even make a prediction as to the precise effects he believes unionization will have on his company").