NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross–Respondent,

v.

O'HARE–MIDWAY LIMOUSINE SERVICE, INC., Respondent, Cross–Petitioner.

Nos. 90–1147, 90–1344.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1990.

Decided Feb. 6, 1991.

Barbara A. Atkin, Washington, D.C., Elizabeth Kinney, Chicago, Ill., Aileen A. Armstrong, Barbara Sapin, William A. Baudler, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

Michael A. Abramson, Gail Galante, Chicago, Ill., for respondent.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and WILL, Senior District Judge.*

WILL, Senior District Judge.

O'Hare–Midway Limousine Service, Inc. asks us to set aside an order of the National Labor Relations Board ("Board") affirming the Administrative Law Judge's ("ALJ") decision that a Company driver, Kenneth Berg, was not an independent contractor and finding that the Company had violated the National Labor Relations Act ("Act"), 29 U.S.C. § 151 *et seq.*, by denying Berg a shift change, interrogating him and finally discharging him. The General Counsel has filed a cross-petition for enforcement of the order. We affirm the Board and order enforcement.

I

O'Hare–Midway Limousine Service, Inc. (O'Hare–Midway or Company) operates a limousine service primarily serving passengers traveling to and from O'Hare and Midway airports. The Company dispatches

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

three categories of limousines: vehicles owned or leased by the Company (company cars), vehicles managed by the company but owned by other companies or individuals (managed cars), and cars driven by owner-operators. Kenneth Berg was a driver for the company during several different periods, the last beginning in March 1985. During most of his tours of duty Berg drove a company car.

In June 1987, Berg became involved in organizing activities in support of an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO ("Union"). Berg signed a union authorization card and distributed cards to other drivers at O'Hare Airport. The Union filed a representation petition with the Board's Chicago regional office on August 10, 1987 seeking a unit consisting of drivers of vehicles owned, leased and managed by the Company. In September, Berg attended a pre-election representation petition hearing on the Union's behalf. The Regional Director ordered an election after O'Hare–Midway unsuccessfully attempted to procure dismissal of the Union's representation petition on the basis that all of its drivers were independent contractors. The Board denied O'Hare–Midway's request to review the Regional Director's decision but ordered drivers of managed cars to be excluded from the unit. An election was held on December 12 and 14, 1987, during which Berg acted as a union observer.

Berg filed unfair labor practice charges against O'Hare–Midway in January 1988 alleging that the Company had violated § 8(a)(1) of the Act by interrogating him regarding his union activities and § 8(a)(1) and (3) of the Act by discriminatorily refusing to grant him a shift change. After a hearing was held on these charges, O'Hare–Midway terminated Berg's employment and he subsequently filed an unfair labor practice charge challenging his discharge. On June 28, a hearing was held before ALJ Nancy M. Sherman consolidat-

ing all of Berg's unfair labor practice claims. She concluded that: (1) Berg was an employee as defined by Section 2(3) of the Act; (2) O'Hare–Midway had violated Section 8(a)(1) of the Act by interrogating Berg about union activity; (3) O'Hare–Midway had violated Section 8(a)(1) and (3) by refusing Berg's requested shift change; and (4) O'Hare–Midway had violated Section 8(a)(1), (3) and (4) of the Act by discharging Berg. She entered a cease and desist order against the Company and ordered that Berg be reinstated to the same or a substantially equivalent job with the shift schedule he was refused and back pay.

■ On June 15, 1989 the Board entered an order adopting the ALJ's recommended order in full. We must enforce the Board's order if, after viewing the record as a whole, it is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## II

■ Independent contractors are exempt from NLRB jurisdiction under Section 2(3) of the Act. 29 U.S.C. § 152(3).[1] Whether an individual is an employee under the Act requires a fact-bound determination applying common law principles of agency. *NLRB v. United Insurance Co. of America*, 390 U.S. 254, 258, 88 S.Ct. 988, 990, 19 L.Ed.2d 1083 (1968). Such an inquiry centers on the employer's ability to control the purported employee. *E.g., NLRB v. Sachs*, 503 F.2d 1229, 1233 (7th Cir.1974). The word "control" suggests the need for an examination of many characteristics of an employer-worker relationship which may include: how payment for services is determined; whether the employer provides benefits; who provides the tools and other materials to perform the work; who designates where work is done and whether the relationship is temporary

---

**1.** 29 U.S.C. § 152(3) provides in relevant part: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this sub-chapter explicitly states otherwise ... but shall not include any individual ... having the status of an independent contractor...."

or permanent. *See Wardle v. Central States Southeast and Southwest Areas Pension Fund*, 627 F.2d 820, 824 (7th Cir. 1980); *North American Van Lines v. NLRB*, 869 F.2d 596, 599-600 (D.C.Cir. 1989), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). The core question is whether the employer controls the manner and means by which work is performed. *Sachs*, 503 F.2d at 1233.

■ The Regional Director's decision, upon which the ALJ relied, cites numerous aspects of O'Hare–Midway's relationship with its drivers which provide ample support for the Board's conclusion that Berg was an employee. When O'Hare–Midway's drivers are first employed they may select the a.m., p.m. or all-day shift, but a driver may not change his or her work schedule, or terminate a shift early, without the Company's permission. Drivers keep only 40 percent of the gross fares they take in and they must turn in the remaining 60 percent to O'Hare–Midway. The drivers are required to adhere to company rules regarding the manner in which they collect fares and service passengers, including maintaining records of each fare received. O'Hare–Midway has the right to fine or reprimand the drivers for failure to comply with company procedures and the Company also retains discretion to refuse to provide a driver with a vehicle. All drivers must also follow a mandatory dress code which requires them to wear a black suit, dark tie and a white shirt. Although drivers buy their own gasoline and absorb the losses for delinquent passengers, and although the Company provides no benefits to its drivers, makes no deductions for social security and does not withhold state and local income taxes, on balance, the evidence was substantial that Berg was not an independent contractor.

Cases cited by O'Hare–Midway holding that lessee cab drivers are independent contractors do not compel a different result. *See Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America v. NLRB*, 603 F.2d 862 (D.C.Cir.1978); *Yellow Taxi Cab of Minneapolis v. NLRB*, 721 F.2d 366 (D.C.Cir.1983); *NLRB v. Associated Diamond Cabs*, 702 F.2d 912 (11th Cir.1983). The decisive factor in those cases was the lack of any financial interdependence between the taxicab companies and the cab drivers. The cab companies earned the same income irrespective of any individual driver's fare intake since the companies profited solely from lease contracts with the drivers, and the cab drivers did not account for their earnings nor did the companies control the hours the lessee drivers operated the leased cabs. By contrast, O'Hare–Midway has a direct financial stake in the amount of fares collected by its drivers, requires extensive reporting of each driver's productivity and the Company determines the hours its drivers may work. Unlike the taxicab companies, O'Hare–Midway has significant control over the manner and means by which its drivers perform their jobs.

We conclude there is substantial evidence to uphold the Board's conclusion that Berg was an employee under the Act.

### III

■ O'Hare–Midway argues that, assuming Berg is an employee, it did not commit an unfair labor practice by denying Berg a shift change. The facts relevant to the refusal of the shift change are essentially as follows. When Berg was hired by O'Hare–Midway he was scheduled to work the all-day shift, which runs from 5 a.m. until as late as 11 p.m. or when the drivers are released in the evening by the Company's dispatcher. In August 1987, Berg was permitted to switch to the a.m. shift by the Company operations manager, Neal Mehr. Two months later, and one month after Berg attended the pre-election hearing, Berg asked to return to the all-day shift. Mehr refused. In December, soon after the representation election, Berg again asked to be put back on the all-day shift and again this request was denied. Mehr never gave Berg a reason for his refusals to grant the shift change.

The General Counsel is required to demonstrate that O'Hare–Midway was at least partially motivated by Berg's union activity

when it denied the shift change in order to establish a violation of Section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3).[2] After the General Counsel has offered this evidence, the burden shifts to the Company to rebut the evidence of discriminatory motive or to proffer a legitimate business justification for refusing Berg's request and to prove that it would have denied the request even in the absence of Berg's union involvement. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983). To meet its burden, O'Hare–Midway argues that it denied the shift change because it was no longer scheduling all-day. drivers and because Berg was not a reliable employee given his absentee record and because he went drinking in the evening while driving company cars.[3]

The ALJ discredited Mehr's testimony that he denied the shift change because the Company was no longer scheduling all-day drivers. The record substantially supports her conclusion. Mehr's statements were not corroborated by any other evidence and Mehr himself offered conflicting testimony about the status of all-day drivers, testifying on the same day that the Company was no longer using all-day drivers but then contradicting himself by stating that there was a need for all-day drivers. The ALJ also discredited the Company's witnesses regarding Berg's drinking and work record, noting that the Company never confronted him with a drinking problem and never disciplined him or gave him any sort of warning about his attendance record, which, in any event, contained largely Company approved absences for which Berg sought and obtained Company permission in advance.

The Board's decision here was based primarily upon the ALJ's credibility determinations and her reasonable inferences drawn from the evidence, and we will not normally second guess such findings even if other interpretations of the record are possible. *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 836 n. 9 (7th Cir. 1984); *Justak Bros. & Co., Inc. v. NLRB*, 664 F.2d 1074, 1078 (7th Cir.1981); *cf. NLRB v. Stor–Rite Metal Products, Inc.*, 856 F.2d 957 (7th Cir.1988) ("The significance of the findings of the ALJ depends largely on the importance of credibility determinations to the outcome of the case."). Given the conflicting evidence regarding the alleged Company policy against scheduling all-day drivers, the Company's failure to confront Berg about his purportedly poor work record, and the evidence of the Company's opposition to unionization, for which Berg was known by Company management to be an active supporter, there is substantial evidence in the record to support the Board's determination that the reasons cited by the Company for denying the shift change were pretextual and that Berg would not have been denied his request to return to the all-day shift but for his union activities.

IV

■ The Company further contends that the Board incorrectly concluded that Berg was unlawfully discharged after he testified at the unfair labor practice hearing held on March 30 and 31, 1988. At that hearing, Berg testified that although he had never been stopped for drunk driving while working for O'Hare–Midway, he had, on an unspecified date, been "stopped" for drunk driving in between his several tours

---

**2.** 29 U.S.C. § 158(a)(1), (3) provide:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7.
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. Section 7, 29 U.S.C. § 157, guarantees employees "the right to self-organization, to form, join or assist labor organizations ..."

**3.** O'Hare–Midway also argues that because Berg did not engage in concerted activity when he requested the all-day shift there is no basis for 8(a)(1) and (3) violations. The General Counsel correctly points out that the Board concluded that Berg was denied a shift change because of his union activity, but it did not, and did not need to, consider whether requesting a shift change was itself protected activity.

of duty with the Company, a fact which he had not revealed during his employment screening. After the hearing on March 31, Berg told Mehr that he would be able to work the following day. Mehr informed Berg that no company car would be available to him because of Berg's testimony admitting the drunken driving, in effect discharging him. When Berg subsequently telephoned Mehr, Mehr confirmed the discharge. O'Hare–Midway asserts that the basis for the discharge was Berg's drunk driving violation and his failure to disclose this information when he applied to work for the Company in 1985.

The application which Berg completed in March 1985 asked him to list all traffic violations which he had received within the last three years. Berg listed a February 1984 lane usage violation, which he received while driving his own car, but did not list a concurrent ticket for driving under the influence. The ALJ credited Berg's testimony that he had pleaded guilty to the DUI charge, paid a fine and was given a one year suspension which he believed expired one year after he received the ticket, although it actually expired on April 1, 1985, one year after his DUI plea. During the hearing, however, prior to discharging Berg, Mehr did not know whether the stopping had occurred within three years of Berg's application date or even whether Berg had been issued a ticket when he was stopped, and the ALJ did not conclude that it was apparent the lane usage violation and the DUI violation must have occurred concurrently simply based on Berg's testimony. Despite protestations of O'Hare–Midway's counsel to the contrary, the record is devoid of evidence that O'Hare–Midway did anything to discover the circumstances of the drunk driving offense until after Berg had been discharged. The ALJ found that, after the hearing had ended and after Berg had been refused use of a company car, O'Hare–Midway's counsel telephoned Lake County, Illinois to obtain information about Berg's driving record and then informed the Company that Berg

was under supervision for drunk driving when he completed his O'Hare–Midway driver application. The record supports the ALJ's conclusion that the verification of Berg's driving record was simply an afterthought.

The Board properly looked to circumstantial evidence to determine that Berg's discharge was illegally motivated. *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 626 (7th Cir.1981). Given the circumstances surrounding Berg's discharge, particularly its timing, which occurred immediately after the unfair labor practice hearing, O'Hare–Midway's ex post justification for the discharge, and the other evidence regarding the Company's antiunion animus, there is substantial evidence in the record to support the Board's conclusion that Berg was terminated because he filed charges and testified against the Company, and because of his other union involvement, rather than because of the content of his testimony, in violation of Section 8(a)(1), (3) and (4) of the Act.[4] *See NLRB v. Town & Country LP Gas Service Co.*, 687 F.2d 187, 192 (7th Cir.1982); *NLRB v. Rain–Ware, Inc.*, 732 F.2d 1349, 1354 (7th Cir.1984). The Company has failed to demonstrate that the Board erred in determining that the impetus for the discharge was primarily antiunion animus and that Berg would not have been discharged absent this improper motivation.

### V

■ O'Hare–Midway also challenges the Board's award of reinstatement and back pay, including lost pay beginning October 13, 1987 when Berg was denied the shift change. O'Hare–Midway contends now, although not before the ALJ, that it is "inconceivable" that it would have hired Berg if it had been aware of Berg's complete driving record and asserts further that permitting Berg's reinstatement is contrary to public policy and the Company's own safety policy.

The record, however, is devoid of evidence regarding any Company safety poli-

---

4. Section 8(a)(4), 29 U.S.C. § 158(a)(4), provides:
   (a) It shall be an unfair labor practice for an employer—

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under the Act.

698

cy which would mandate Berg's discharge or would have prevented his employment in the first instance, and there is no evidence of any policy under which drivers were terminated if they failed to cite in their application traffic violations within the preceding three years.[5] Drunk driving is a serious offense, but nothing in the record demonstrates that Berg's supervision for drunk driving, which permitted him to retain his license, and expired three weeks after he applied for work with O'Hare–Midway, following a year with no further violations, made him unfit to work for the Company as a driver or rendered his reinstatement otherwise ill-advised. *See NLRB v. National Furniture Manufacturing Co.,* 315 F.2d 280, 287 n. 7 (7th Cir.1963). Moreover, the Board reasonably determined that Berg's failure to disclose his DUI violation was not a deliberate falsification of his driver application and, in any event, there is no evidence that Berg would not have been hired if he had accurately completed his application. We conclude that the Board properly granted Berg reinstatement and back pay.

Finally, although the Company asserts that the Board erred in finding that Berg was interrogated by Company president George Parker in violation of § 8(a)(1), we need not reach the merits of this argument since the finding of unlawful interrogation simply resulted in a standard cease and desist order which was properly imposed as a remedy for the Company's unlawful conduct regarding the shift change and Berg's discharge. Any decision regarding the questioning would not alter the remedy imposed, so we do not address the propriety of the Board's conclusion here.

CONCLUSION

We conclude that the Board's decision is supported by substantial evidence, and thus we affirm and order enforcement.

---

**5.** The only relevant evidence in the record in fact shows that O'Hare–Midway did not routinely terminate a driver for an omission on a job application. Berg was not discharged in Janu-

ary 1988 when the Company discovered that he had received a speeding ticket a year and a half before he applied to work for O'Hare–Midway which he did not disclose on his application.